## The Marquette & Ontonagon Railroad Company v. Harvey S. Taft.

*Railroads: Agency: Yard-master: Employment of physician.* A railroad yard-master whose business is to have charge of the yard, make up trains in the yard, and who has a right to employ men for all purposes they are required for in the yard and to do his part of the business, and to discharge them, to employ brakemen for himself and also for the road trains, and whose authority consists in employing men in his department, has no authority by virtue of his office alone, to bind the railroad company employing him, in the employment of a surgeon to attend one of the men under him in the service of the company, who had been run over and injured by the company's cars.

*Railroads: Servants: Injuries to employes: Reckless servants.* While as a general rule a railroad company is not liable for injuries received by their employes in their service, caused by the negligent conduct of another servant, yet this rule is subject to the exception of cases where the injury comes from the negligent employment by the company of reckless or incompetent servants or worthless machinery: per COOLEY, J., with whom CHRISTIANCY, CH. J., concurred.

*Agency: General superintendent: Employment of physician.* Whether or not a railroad company can be held bound by the employment by its general superintendent of a surgeon and physician to attend one of its servants who had been injured by their cars while employed in their service, in the absence of any showing of authority aside from that to be inferred from the fact of his being general superintendent:—*Quære?*—COOLEY, J., with whom CHRISTIANCY, CH. J., concurred, holding the affirmative, and GRAVES, J., with whom CAMPBELL, J., concurred, holding the negative.

*Practice:* The court being equally divided, the judgment of the court below is affirmed.

*Heard April 16.    Decided November 5.*

Error to Houghton Circuit.

28 MICH.—37.

*Ashley Pond,* for plaintiff in error.

*Wilkinson & Post,* for defendant in error.

GRAVES, J.

One Charles Otto, a laborer for plaintiff in error, was accidentally struck, while in their service, by one of their cars, and seriously injured. The yard-master of the company, Mr. Theil, who had charge of the business and men in the yard where Otto was at work at the time, caused him to be immediately removed to his boarding-house, and also procured the defendant in error, who was a surgeon, to attend him. Doctor Taft thereupon rendered services for which he charged the company two hundred and twenty dollars. Payment of the bill was refused, and he sued the company and recovered, and the case is now before us upon writ of error and bill of exceptions.

As the company insist that the evidence, all of which is embraced by the bill of exceptions, had no tendency to show a liability on their part, that question is naturally the first to be considered. Their position is that Otto was in their service, and that *prima facie* they were not therefore liable to him on account of the injury, and as a consequence were not bound to provide or pay for medical services which the injury necessitated; that under these circumstances, no authority can be implied, from the nature of his employment, in any agent of the company, to bind them by an agreement to pay Doctor Taft for his services, and that the only evidence of authority was of that kind.

There is evidence in the record tending to show that Thiel informed the doctor that he employed him on behalf of the company, that he reported the fact to the superintendent, Mr. Merritt, and that the latter gave such employment his sanction. We may, then, assume for the purpose of this question, that Thiel the yard-master, and Merritt the superintendent, employed the doctor to attend Otto, and promised that the company should pay him. The question

presented is purely one of agency, and however strong may be the force of imperfect obligation on the company, or however we may feel as to what humanity may dictate, the court can go no further than the law goes. Unless the plaintiffs in error were in law bound by the doings of their agents Theil and Merritt, they were not liable; and unless those agents were authorized to contract for the company to pay the doctor for his services about Otto, the plaintiffs in error were not in law bound.

It was an indispensable part, therefore, of the case of defendant in error to show such authority. Was it shown? There was no evidence of Theil's authority further than this: He testified that he had charge of the yard, made up trains in the yard and had a right to employ men for all purposes they were required for in the yard and to do his part of the business, and to discharge them; that he had employed brakemen for himself and also for the road trains; that his authority consisted in employing men in his department.

Now, the affairs of a railroad corporation must necessarily be carried on through agents and servants of various grades, and having powers classified and regulated in a manner to correspond with the nature and arrangement of duties. And in the absence of evidence of either express delegation or of usage, the authority of the particular agent must be inferred from facts connected with the business and position.

There is certainly nothing in the evidence respecting the business required of Theil, or in his position in the company's service, which suggests his possession of authority to bind by contracts for professional services. He was a mere yard-master, charged with local and very circumscribed duties, and those duties do not appear to have had any connection with the employment of professional assistance for the company.

In respect to Mr. Merritt, who in the record is called superintendent, the case is somewhat different. It is, of

course, correct to say that the office of superintendent may be made to embrace an authority to employ and pay surgeons in such a case as this. And I think it is not too much to add that it was the duty of the company to keep lodged where it could be seasonably exerted a discretionary power for meeting such emergencies, and that in the interests of humanity it ought to be used cheerfully and liberally.

But the question here is not upon the duty of the company to confer this discretionary power upon some one, but it is whether, upon the facts before the court, there was ground for finding that Mr. Merritt was the possessor of that power. Now, upon that subject there was absolutely no fact to go upon, except that as a servant of the company his title was that of superintendent. There was no evidence of express delegation, or of usage in this company, or of circumstances tending to show either the nature or scope of his powers and duties. The circle of his authority was in no way or sense outlined. Everything was left to inference or implication from the solitary and nearly barren fact that he was an agent called superintendent in this particular corporation. Upon this isolated fact can we lay it down as law, that Mr. Merritt must be taken to have had not merely the ordinary powers of control and management pertaining to superintendency, but the larger and more imperial power to bind the treasury of the company to bestow what in law would have to be considered as something originally resting on imperfect obligation ?

As we have nothing to indicate the nature and scope of Mr. Merritt's agency in this company, except the name it bore, we are not in a situation to make the inference, unless on appealing to general usage the name is found to denote the authority. If agencies containing the high authority claimed are ascertained to have been usually so denominated, and agencies so named are found to have usually embraced it, it may be admissible to consider the name as some evidence of the power. If, however, on the

contrary, the particular agencies covering such high authority have sometimes been so denominated and sometimes not, if agencies having this particular name have sometimes included this power and sometimes not, if there has been no uniform rule in that regard, it appears to me we should not be at liberty to infer the possession of the power from a bare knowledge of the name.

Now it is well known that the superior powers of control and management, and especially such of them as bear upon extraordinary outlays and liabilities, are variously arranged, distributed and classified; and that the interior corporate arrangements and regulations of railroad companies follow no model, and differ greatly in different companies, and that the same companies do not constantly adhere to a single plan.    Modifications of the system of administration are frequently made.    There is no uniformity of plan, as between different companies, as to the precise amount of power indicated by the names of agencies, and the same company does not always follow the same course in that respect.    Some powers, from their nature, may be reasonably looked for in one department, or as connected with one position, and others may be expected to belong elsewhere.    But there are many special and peculiar powers, of which that in question is one, which do not regularly or naturally place themselves under pre-recognized titular heads, and they are subject to distribution among the superior agencies of each company, according to its views of policy.    The name chosen by one company to cover such powers, cannot be safely predicted from a knowledge of the regulations on that subject in another company.

In some companies the superior managing officer is called manager, or general manager, in others managing director, in others president, and in others still, superintendent.    There may be, and probably are, companies in which the main active agent bears some other title.    Even in companies in which there is an agent called superintendent, the name does not represent the same or any thing like

the same powers and duties in all cases.   In some cases the president or other official has an authority which covers much of the ground which is occupied by the power of the superintendent in others.   The name, then, is no sufficient guide on a question of this kind.   Admitting that some superintendents have the power claimed for Mr. Merritt, I think it cannot be inferred from thence, and thence only, that Mr. Merritt possessed it.

The class of powers to which this belongs has been arranged capriciously, and the name superintendent has not uniformly been employed as an exponent of such power.

It would be quite as sound reasoning, it seems to me, to infer from a knowledge of the powers of the presidents of France and Mexico to involve their governments, a like power in the president of the United States to involve ours.

On the whole, I am constrained to think that the case failed upon the question of authority to bind the company, and that the judgment should therefore be reversed, with costs, and a new trial ordered.

CAMPBELL, J., concurred.

COOLEY, J.

Taft brought suit against the railway company to recover the amount of his bill as a physician and surgeon, for services rendered to a servant of the company who had been injured in its service.   The injury was caused by the man being run over by the company's cars, and the services consisted in the amputation of a limb, the binding up of severe wounds and bruises, and attendance upon, and care for them afterwards, while medical care was required.

The disputed question in the circuit court was, whether the railway company had ever employed the plaintiff to perform these services.   His testimony went to show that he was first called upon to attend the injured person by the company's yard-master, at the place where the injury occurred, who assumed to speak on behalf of the company,

and whose action was subsequently ratified by the general superintendent. The testimony for the defense, on the other hand, tended to show that the plaintiff was never employed on behalf of the railway company, and that neither the yard-master nor the superintendent had authority for this purpose. The argument for the railway company assumes that no agent or employe of the company can have authority to call in a surgeon to attend upon a person in their employ who has the misfortune to be injured in their service, unless specially empowered by the directors to make contracts of that peculiar nature. On the other hand, the plaintiff in the suit below contends that the general superintendent must be assumed, by virtue of his office, to have the requisite authority for this purpose; and upon that assumption the case seems to have been fairly submitted to the jury.

There are in this state more than three thousand miles of railway, operated by means of several hundred steam engines and several thousand cars. The railway companies own a considerable number of manufacturing and repair shops, some of which are very extensive, and they employ in different capacities many thousand men. Their business is peculiarly dangerous, and the liability of persons in their employ to serious accidents with or without any fault of their own, is constant. A large proportion of their employes are men of limited means, who depend upon their daily labor for the support of themselves and of their families, and an accident which disables one is likely to leave more or less persons in a destitute and dependent position. It is a rule of law, settled on grounds of public policy as much as on contract, that one who enters the service of another takes upon himself all the usual risks incident to the employment, and consequently that the servants of a railroad company cannot recover damages of the company for injuries received in their service in consequence of negligent conduct of another servant, as a passenger upon the company's road or any third person might do.

If, therefore, any thing is paid by the company to the injured servant in such cases, it is by way of gratuity, and not by way of compensation. This rule is subject to an exception which will be mentioned hereafter. The business of such a company is managed by a board of directors, which will meet annually, and as much oftener as the necessities of the corporation may seem to require, but it is not expected to be constantly, or even very often in session. It is the legislative body of the corporation, and will lay down general rules for the management of its business, and appoint executive officers to give them effect. It is reasonable to presume that the rules established by this board will be those supposed to be necessary to advance and protect the interests of the company, and that its members will not be solicitous to establish those which will impose burdens upon the company, even though a duty might rest upon the company to bear such burdens. And even if we were to assume that the directors would be willing and desirous to provide for the discharge of all the moral obligations fairly resting upon the company, and that providing medical or surgical aid to an injured employe was one of these, it is doubtful if the subject would be deemed of sufficient importance to the interests of the company to occupy the attention of a board, which, from the nature of the case, can be expected only to meet at considerable intervals, and to discuss and settle general principles and the most important matters, leaving details to executive officers and subordinates.

The result very likely is, if the position taken by the railway company in this case is sustained, that if a laborer for any one of the railway corporations in this state, in any of their yards or machine shops, or on any of their trains or tracks, is run over or injured by one of their trains or by any of their dangerous machinery, in consequence of the neglect or default of some other servant or agent of the company, there is not only no legal obligation resting upon the company to provide him the necessary medical or surg-

ical care and assistance, but there is not, unless the board of directors should happen to be in session, even the necessary power for the purpose in the hands of any officer of the company, and the injured person may be left where he has fallen or been stricken down, to suffer and perhaps to die of neglect, though the officers of the company might be willing and disposed to recognize and discharge any moral obligation resting upon the company to aid him if it were within the scope of their agency to do so.

If there is any exception to this sweeping statement, it will probably be found in the case of some company which keeps a physician and surgeon regularly employed in its own service, who would perhaps be expected to look after such cases; though doubtless the principal reason for such employment, where it exists, is to protect the company against unfounded or excessive demands by persons for whose injuries the company is or may be responsible, rather than to give aid in cases like the present.

There can be no doubt that it is within the scope of somebody's employment for a railway company to cause a beast which is injured in carriage or run over at a crossing to be picked up and have the attention proper and suitable to its case; and if no one is authorized to do as much for the faithful servant of the company who is in like manner injured, but all persons in its service are impliedly forbidden to incur on its behalf any expense beyond what may be necessary to remove him out of the way of their trains or machinery—even to convey him to his house, or to save his life by binding up a threatening wound—then if such is the law, the courts must not hesitate to apply it, even though it be impossible to avoid feeling that it ought not to be the law, and that no business of this extensive and hazardous nature ought to be suffered to be carried on with no one for the major part of the time empowered to recognize and perform a duty which, at least on moral grounds, is so obvious and imperative.

But we do not think such is the law. On the con-

28 MICH.—38.

trary, we think it is within the general scope of the
employment of a railway superintendent to make such a
contract as the jury have found was made, in this case,
and that no evidence to prove a special authorization is
requisite.     The nature of the powers of a railway superin-
tendent is indicated by the title to his office.     He has the
general superintendence of the business of the corporation,
and is the immediate representative of the corporation in
all business transactions with the public.     This is the
general fact, though there are undoubtedly cases where
these general powers are, in part at least, conferred upon
the president, or some other officer.

There is no evidence that this case was exceptional, and
we must consequently assume that this superintendent had
the usual powers of general supervision.     In all that per-
tains to the general management and operation of the road
he speaks and acts for the company, and he must decide
for it, and may make contracts on its behalf in the emer-
gencies which unexpectedly arise, connected with, or grow-
ing out of the running of their trains, the transportation
of persons or property, and the management and control of
servants.     He hires servants and he discharges them, and
if he negligently or knowingly employs incompetent or
reckless servants, or purchases and uses unfit machinery,
his negligence is not to be regarded as the negligence of
an agent merely, but of the company itself, in whose place
and stead he stands and acts; and an inferior agent who
receives an injury in consequence of such negligent action
on his part may recover damages from the company as for
its own wrong.     These are well understood rules, and we
know of no limitation upon his powers which confines him
to a recognition of obligations of a strictly legal nature
only, or which can forbid his meeting and providing for
the moral obligations which the employer, if a natural
person, ought in common humanity to recognize and pro-
vide for, whether required by law to do so or not.

Nor do we understand what rule there can be, either of

law or reason, to preclude the courts taking judicial notice of the powers of a superintendent of a railroad, as it has often been held they may of those of the cashier of a bank. See *Farmers and Mechanics' Bank v. Troy City Bank, 1 Doug., 457.* In fact the courts do often take judicial notice of the powers even of inferior officers. No one, for instance, would think it necessary to make proof that a freight agent may enter into a contract for the carriage of cattle, though the name of his agency no more points out the scope of his duties than does that of the superintendent indicate his general supervision. And if we were to require proof of all such matters when called upon to decide the various questions touching the powers, duties and modes of business of railway companies, we should find ourselves utterly power- less in the great majority of railway cases which come before us, to deal intelligently with the questions raised. But in fact we do habitually take notice of these things, as the whole community does in dealing with these corpora- tions; and a refusal to do so would be not only a refusal to do what we do constantly in other cases, but it would often amount to a denial of justice.

We shall not stop to prove that there is a strong moral obligation resting upon any one engaged in a dangerous business, to do what may be immediately necessary to save life or prevent an injury becoming irreparable, when an accident happens to a person in his employ. We shall assume this to be too obvious to require argument, though at the same time we shall concede most fully that the question how far the obligation will require the employer to go in the expenditure of money for medical or surgical care, for the assistance of nurses, or for other provision for the injured person's necessities, must generally be one to be determined by the employer alone.

We do not subscribe to the doctrine, that because persons associate together to conduct a business as a corporation, therefore they are to be held to any stricter rules, or to be treated with any less liberality by courts or juries, than

they should be if they were to carry on the same business
without taking upon themselves corporate powers.    Neither
on the other hand do we believe that the artificial person
should be exempt from any of the obligations, either legal
or moral, which a natural person, engaged in the same
business, would be subject to, except so far as the legisla-
tion under which it is created shall have exempted it, or
that when its managing authorities have attempted to make
a moral obligation fairly resting upon the corporation and
growing out of its business the reason for entering into a
legal contract under circumstances which would render it
legal in the case of a natural person, it should be allowed
to repudiate the contract on any pretence of want of power
to make it.    The same rules ought to apply alike to both,
and reasons of public policy of the most conclusive nature
require that corporations should not be at liberty to plead
peculiar exemptions in these cases.

     This precise question has been judicially passed upon in
several cases, and it is gratifying to know that the rule of
justice and of public policy, which seems to us so obvious,
has been recognized elsewhere with a single exception, and
that in a court of inferior jurisdiction.    In *Stephenson v.
New York and Harlem R. R. Co., 2 Duer, 341*, it was
decided that it was not within the general authority of the
superintendent of a railroad "to arrange and liquidate claims
made against the company for the negligence of its servants
in running its trains, or to contract with third persons, as
its agent, to repair or remedy the consequences of such
negligence."    And accordingly it was held that the super-
intendent could not contract on behalf of the company for
medical assistance to a child run over by the cars of the
company.    This decision, so far as we know, stands alone,
and we hazard nothing in saying that it is opposed to the
general, if not universal, practice of railroad companies in
similar cases.    Not only is it generally understood that the
superintendent of the company may in such cases, as its
agent, contract to repair or remedy the consequences of the

negligence of other agents and servants of the company, but it is usually regarded as proper and prudent that he should proceed to do so immediately, and thereby preclude litigation in every instance in which parties are disposed to be reasonable and to adjust, on a proper basis, any claims they may have for injuries caused by the negligence of the railroad employes.

It would be a surprise, probably, to most superintendents, to be told they had no power to adjust any such claims, and to most boards of directors to be told that they could only confer such power by express and special delegation.

On the other hand, in *Walker v. The Great Western R. Co., Law Rep., 2 Exch., 228*, it was held that the general manager of the railway company has, as incidental to his employment, authority to bind the company to pay for the surgical attendance, bestowed at his request, on a servant of the company injured by an accident on their railway. The court appear to have thought the case almost too plain for argument; and in distinguishing it from *Cox v. Midland Counties R. Co., 3 Exch., 268*, where it was held a station master had no such authority, it was pointed out that the law regarding the mode of contracting by corporations has been greatly modified since that decision was made; as if it might now be open to discussion whether even in case of a station master the rule might not be different.    In *Toledo, Wabash & Western R. R. Co. v. Rodrigues, 47 Ills., 188*, a case in all its facts strikingly analogous to the present, the railroad company was held liable. The court avoid expressing an opinion whether the station master had authority to make such a contract, but they say of the general superintendent that he is "clothed, and must necessarily be, with large specific as well as discretionary powers.    As his title implies, he has a general superintendence of the business affairs of the road, and we deem it but a reasonable inference to conclude that this was within the scope of those powers, and when exercised

that the company must be held liable.     The corporation is governed, within the limits of its charter, by the adoption of rules and regulations for the purpose.     These regulations govern the action of its officers.     By them they confer powers and impose duties on their various agents and offi-cers; and by this means they exercise their franchises. These regulations are private, and not accessible to the public, and hence the difficulty of other persons showing, except by inference or circumstantial evidence, that any officer performs any act within the scope of his authority. It would therefore not be reasonable to require positive proof of such authority.     That fact must be left to proof as in other cases.     And when it is known that the gen-eral superintendent manages all the business of the road within his department, and binds the company by contracts on its behalf, in regard to its general business, it may be safely inferred that such a contract as this was within the scope of his authority."     We agree with this case fully, except in one particular.     We doubt the right of the rail-road company to show that authority to provide for such cases has been withheld from the superintendent, unless they go farther and show that they have conferred it upon some other officer.     We think it their duty to have some officer or agent, at all times, competent to exercise a dis-cretionary authority in such cases, and that on grounds of public policy they should not be suffered to do otherwise.

The case last referred to was followed in *Toledo, Wabash & Western R. R. Co. v. Prince, 50 Ills., 26.*     There the station agent employed the surgeon and reported the case to the superintendent, and it was held that unless that officer dissented from the action of the station agent, and directed the agent to inform the surgeon, his neglect to do so would be an implied ratification of the employment.     And the court remark that "although a railway company is under no legal obligations to provide medical attendance for persons injured in its service, yet this would be so reasonable a thing to do, where the wounded employe is dependent upon

his daily labor for his support, that a jury will generally find, even upon somewhat slight evidence, that the act of the station agent in employing the surgical skill necessary to save human life was ratified by his superiors."

It is proper to say, however, that we are not at liberty to conclude from the mere fact of the injured person being the servant of the company that he can have no redress for his injuries. This is the general rule, unquestionably; but it is always possible that his case may be an exception to the general rule, and that he may be able to show that his injury came from the negligent employment by the company of reckless or incompetent servants or worthless machinery. But we are not disposed to attach importance to that circumstance, though it is evident, even on the argument made on behalf of the railway company, the proper officer might contract with a surgeon for such services if the company were responsible for the injury, and that the making or ratification of the contract by the superintendent might reasonably be regarded as some evidence that in his opinion the company might be liable, or at least that the question was sufficiently in doubt to warrant some expenditure of money to remedy the injury.

These views dispose of the case unless the court erred in refusing to instruct the jury that unless they should find the plaintiff was employed by some authorized agent of the company, or that such authorized agent consented to such employment on behalf of the company, the plaintiff cannot recover. This proposition is correct, but the judge has already correctly instructed the jury as to the grounds on which the plaintiff might recover, and probably the only reason why it was not given in these words was that they left out of view the important fact that in this case the plaintiff relied, not upon an original employment by the superintendent, but upon a ratification of an unauthorized employment by a subordinate. The judge might well have supposed that a charge in these words might lead the jury to think the ratification unimportant. Taken as a whole, we think the charge laid

down correct rules, and could not have misled the jury to the prejudice of the company.

In our opinion the judgment of the circuit court should be affirmed, with costs.

CHRISTIANCY, CH. J., concurred.

The court being equally divided as to whether there was error in the rulings of the court below, the judgment is affirmed under the statute.—*Comp. L. 1871,* § *4923.*