## Davies, Appellant, *v*. McDowell National Bank.

210

Argued March 16, 1962. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN and O'BRIEN, JJ.

*Philip E. Brockway,* with him *Brockway and Brockway,* for appellants.

*Hiram M. Drake,* with him *Donald R. McKay,* and *Wiesen, Cusick, Madden, Joyce, Acker and McKay,* for appellee.

OPINION BY MR. JUSTICE EAGEN, April 17, 1962:

On the afternoon of November 18, 1959, Carl F. Davies and his wife, Mary E. Davies, visited the business office of J. Fred Thomas in the City of Sharon, Pennsylvania. A tragic accident ensued. Carbon monoxide poisoning caused the deaths of both J. Fred Thomas and Mary E. Davies and resulted in serious injuries to Carl F. Davies. Actions for damages on behalf of Carl F. Davies and the Estate of Mary E. Davies against Thomas's Estate failed when the court below entered judgments of compulsory nonsuit. Plaintiffs appeal.

The determinative issue is: Was the proof at trial legally sufficient to warrant the submission of the question of negligence to the jury? In evaluating the

testimony in this respect, the record must necessarily be read in the light most favorable to the plaintiffs' cause: *Weisman v. Sauder Chevrolet Co.,* 402 Pa. 272, 167 A. 2d 308 (1961) ; *McKniff v. Wilson,* 404 Pa. 647, 172 A. 2d 801 (1961).

The facts established by the plaintiffs may be summarized as follows: Thomas was the stepfather of Mrs. Davies. He was seventy-one years of age and lived alone. He suffered a stroke and had been seriously ill in the months immediately prior to his death and during this period, while being constantly treated by his physician, had stayed in the Davies home. The doctor advised against his operating his automobile and Mr. Davies had agreed to drive him anywhere he desired to go.

Thomas was an engineer and maintained his office in the Thomas Building in Sharon, which he owned and solely occupied. At about 3 :45 o'clock on the day involved, his physician was called to the Thomas office by Mrs. Davies. Upon arrival, he found Thomas, unconscious, with Mr. and Mrs. Davies attempting to aid and revive him. The physician remained there about thirty-five minutes, and succeeded in bringing Thomas back to a state of partial consciousness. Mr. and Mrs. Davies advised the doctor that they would remain with Thomas until he had recovered sufficiently to be taken to their home for further care.

Shortly after ten o'clock that same night, a police officer visited the Thomas office and found Thomas and Mrs. Davies dead. Mr. Davies was unconscious. An autopsy revealed the cause of death to be carbon monoxide poisoning. An examination of the premises determined the source of the poisonous gas to be a rusted shut damper in the chimney flue pipe leading from the gas-burning furnace which heated the premises. This damper was located inside the flue pipe on top of the furnace, about seven feet off the floor,

A heating expert testified. He was shown a photograph of the flue pipe and damper involved, and opined that the installation of a damper in a pipe leading from a furnace to a chimney is improper and unsafe because "It may become lodged or in a closed position and rust shut. . . ."

It is argued that the doctrine of "exclusive control" governs the instant facts and that, therefore, the burden of coming forward with evidence to establish freedom from negligence was upon the defendant. This is not correct.

It has long been established that the mere showing of an accident and injury will not make out a case for the jury: *Rennekamp v. Blair*, 375 Pa. 620, 101 A. 2d 669 (1954); *DiGiannantonio v. Pgh. Rwys. Co.*, 402 Pa. 27, 166 A. 2d 28 (1960). Fundamentally, the burden of furnishing proof of the existence of negligence is upon those who assert it. However, since the purpose of a trial is to elicit the truth, the doctrine of "exclusive control" has been applied in those cases and those only wherein the evidence as to the cause of the accident is *peculiarly* or *exclusively* within the possession of the defendant or defendants *and not equally available* to the plaintiffs. The basis of the rule being that those who *alone* know the facts are the ones who should in justice be called upon to reveal them. See, *Scott v. The London and St. Katherine Docks Co.*, 3 Hurlstone & Coltman, 596; *Mack v. Reading Co.*, 377 Pa. 135, 103 A. 2d 749 (1954); *First Methodist Episcopal Church v. Bangor Gas Co.*, 388 Pa. 115, 130 A. 2d 517 (1957); *Haddon v. Lotito*, 399 Pa. 521, 161 A. 2d 160 (1960).

It is patently clear that this is not a case wherein proof of the cause of the accident was "peculiarly" or "exclusively" within the knowledge of the defendant, the administrator of Thomas's Estate. The doctrine, therefore, does not apply.

It is asserted that under the evidence the jury could conclude that Mr. and Mrs. Davies were "business visitors" in the Thomas office on the occasion involved, and that the court below erred in concluding that they were merely social guests. If they were "business visitors" the duty of the owner would be to exercise reasonable care in maintaining the premises in a safe condition: *Matthews v. Spiegel*, 385 Pa. 203, 122 A. 2d 696 (1956) and *Slobodzian v. Beighley*, 401 Pa. 520, 164 A. 2d 923 (1960).

There is no specific evidence in the record as to why they visited the Thomas office on the occasion involved. The proof does show that when the physician left they remained there in order to take Thomas to their home when he was physically able. From the relationship existing between the parties and their past close association, the only reasonable conclusion is that they were social guests. Their mere presence upon the premises raises no presumption that they were "business visitors." That they were such may not be conjectured. Nor does the fact that a social guest performs some *minor* or *incidental* service for his host during his stay convert the status to that of "business visitor." See, *Lubenow v. Cook*, 137 Conn. 611, 79 A. 2d 826 (1951); *McHenry v. Howells* (Oregon), 272 P. 2d 210 (1954); *Dotson v. Haddock* (Wash.), 278 P. 2d 338 (1955); *Ciaglo v. Ciaglo* (Ill.), 156 N.E. 2d 376 (1959); *Murrell v. Handley* (N.C.), 96 S.E. 2d 717 (1957); 25 A.L.R. 2d 598.

Social guests are gratuitous licensees. To this class, the owner of a premises is liable for bodily harm caused by a latent dangerous condition existing thereon only if he has knowledge of the condition and fails to give warning thereof, realizing that it involves an unreasonable risk to his guests and that they are not likely to discover its existence, Restatement, Torts, §342; *Rushton v. Winters*, 331 Pa. 78, 200 A. 60 (1938); *Bow-*

*ser v. Artman,* 363 Pa. 388, 69 A. 2d 836 (1949) and *Slobodzian v. Beighley,* supra. There is not a scintilla of evidence herein to establish that the deceased, Thomas, had any previous knowledge of the existence of the latent dangerous condition upon which the cause of action is based.

Judgments affirmed.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

William V. Lavin, assistant chief of police, was making his night rounds in Sharon in the area of the Shenango River close to Sharpsville Avenue and the Ohio Street Bridge when he stopped to try the doors of the Thomas Building, a one-story concrete block structure, owned and occupied by J. Fred Thomas, ex-mayor of Sharon and one time state senator of Pennsylvania. The door yielded to pressure and Lavin entered the building. He noted that a light was burning in the rear room overlooking the river. He approached the window of that rear office, and looked in, and beheld Thomas slumped in a chair. To his left a man was lying inertly on the floor and in the southwest corner of the room Lavin detected a woman on her side, also apparently helpless. He broke into the room, examined the body of Mr. Thomas and concluded life had left it. He bent over the body of the woman and discovered no sign of breathing. At this moment a guttural sound rose from the body of the man prostrate on the floor.

Lavin cast glances around the room for a telephone so that he could report to police headquarters on his grim discovery. He could find no telephone although the room was obviously an office. Later the instrument was discovered beneath the body of the woman, there furnishing mute evidence, by its location, of the dying woman's effort to summon aid to save her from the

disaster which she must have felt overtaking her. Evidently she could not muster the strength to speak into the receiver or she died before the words could reach her lips. It was testified later that someone was trying to call the office at this very time but he was getting a busy signal. The receiver was off the cradle.

Lavin left the building and ran to the Sharon police headquarters about 150 yards away where he called for the chief of police, a physician, and the coroner. He returned to the Thomas office. The city physician arrived shortly thereafter and pronounced Thomas dead. He gave the same verdict regarding the woman on the floor, Mrs. Mary E. Davies. A few moments later the fire department put in its appearance with oxygen equipment, and artificial respiration was applied to the man gasping on the floor, Carl F. Davies. He then was taken by ambulance to the Sharon General Hospital where he received emergency treatment. He survived, but the damage done to his lungs and heart disabled him.

The autopsy performed on the bodies of J. Fred Thomas and Mrs. Mary E. Davies, the latter being the wife of Carl F. Davies, revealed that they both had died from carbon monoxide poisoning.

After the bodies had been removed officer Lavin and two men from the United Natural Gas Company in Sharon set about ascertaining the cause for the carbon monoxide leakage. They found two heating units in the building—in the very room in which the two persons had perished and the third had collapsed. One of the heating units was an oil heater, the other a gas furnace in which a flame burned.

Lavin remained in the building for a total period of an hour and a half, having left it for brief periods on two occasions. At 2:30 the next morning he became so ill that he had to be rushed to the hospital for treatment: he suffered from severe eye-ache, headache, "and

a great desire to vomit." He felt the ill effects of his exposure to the gas for a period of ten days.

On the morning following the day of the tragic occurrence described, the chief of police of Sharon, Joseph R. Matchak, accompanied by men from the local gas company, visited the Thomas Building to make a minute inspection of the gas furnace. Matchak discovered a defect in the gas flue. The damper had become rusted and corroded and could not be moved.

As a result of this inspection, together with other relevant evidence explaining the reason for the death of two persons and the disablement of a third, lawsuits were filed in the Court of Common Pleas of Mercer County by Carl F. Davies and the McDowell National Bank, executor of the estate of J. Fred Thomas, the first suit being for personal injuries, the second being wrongful death and survival actions.

The causes were consolidated and came on for trial before a judge and jury. At the termination of the evidence presented in behalf of the plaintiffs, the defendant in both lawsuits moved for compulsory nonsuit, which was granted, and when the lower court refused to take off the nonsuit, the plaintiffs appealed.

The court below admitted that the cause of Carl F. Davies' injuries and the death of J. Fred Thomas and Mrs. Mary E. Davies, was carbon monoxide poisoning, as the result of a defective flue in the gas furnace. It said further that "we will assume that a jury could have found Thomas negligent in allowing this condition to exist."

But, the court said, there was "absolutely no testimony from which the jury could have inferred that Thomas *knew of* this unsafe condition." (Italics in lower court's opinion.) This is an amazing statement indeed. If Thomas *knew* that his gas furnace was pouring deadly carbon monoxide into his office, he would have been a fool to remain there and inhale it,

knowing that it would kill him. But Thomas was not a fool. He was a man of education and vast experience. But the fact that he did not *know* of the leakage in the gas furnace did not excuse him from fault. The criteria of liability in negligence cases is not alone what the defendant knows but what he *should have known.*

Thomas was a civil engineer and surveyor. He was familiar with machinery. He could easily have detected the corroded damper in the flue of his furnace, if he had exercised the simplest care. But he did not exercise that care. He was careless as many people are careless, not because they consciously determine to be careless but because they are preoccupied with other matters or because of general indolence and inertia. It is because people are indifferent to the simplest rules of safety that they cause the asphyxiation of other people, it is because of carelessness and heedlessness that bridges collapse, buildings crumble, airplanes crash, and blood flows like water on the highways of the nation.

The trial court said, as indicated, that the "jury could have found Thomas *negligent in allowing this condition to exist."* If the jury could find that Thomas was negligent, why did the court enter a nonsuit, and why has the Majority of this Court affirmed that nonsuit? If Thomas was negligent in allowing an instrumentality or device on his property which could endanger the lives of others, he would be liable in damages to those who suffered because of that dangerous agency. Thomas would not have to have had direct knowledge of the perilous device on his property in order to be found liable. Without immediate access to statistics on the subject I believe it would be safe to say that there are as many cases where the property owner is liable because of constructive knowledge of a dangerous condition on his land as where he has positive knowledge of that condition.

The Majority Opinion in this case concedes that the physical condition on Thomas's property spelled out a prima facie case of negligence. It says: "An examination of the premises determined the source of the poisonous gas to be a rusted shut damper in the chimney flue pipe leading from the gas-burning furnace which heated the premises. This damper was located inside the flue pipe on top of the furnace, about seven feet off the floor. A heating expert testified. He was shown a photograph of the flue pipe and damper involved, and opined that the installation of a damper in a pipe leading from a furnace to a chimney is improper and unsafe because 'It may become lodged or in a closed position and rust shut . . .'"

But the Majority argues that Carl and Mary Davies were "social guests" and that, therefore, Thomas could be liable for bodily harm caused by a latent dangerous condition only if he had knowledge of the condition and failed to give warning. But the very fact that the locale of the tragedy was a business office would in itself raise a presumption or inference that the Davies were not there as "social guests." Of course, on the other hand, it would have to be admitted also that the fact that Mrs. Davies was a step-daughter of Thomas, could raise the inference that she was there for reasons other than business, but where there is a clash of inferences it is the jury which determines which one more closely approximates reality. A case is not to be taken from the jury where, under one inference, the plaintiff is out of court, but under another inference he remains in court. In *Smith v. Bell Telephone Company*, 397 Pa. 134, 139, Justice McBride speaking for this Court, excellently stated: "The right of a litigant to have the jury pass upon the facts is not to be foreclosed just because the judge believes that a reasonable man might properly find either way. A substantial part of the right to trial by jury is taken away when judges withdraw close cases from the jury." "Where

there can be a reasonable inference that an unwitnessed accident could have been caused in a tortious manner, the jury is the tribunal to unscramble the facts and determine where liability rests, if at all.": *Gash v. Lautsenhezer*, 405 Pa. 312, 317.

The Majority Opinion in the case at bar says that "There is no specific evidence in the record as to why they [the Davies] visited the Thomas office on the occasion involved." This statement would seem to disregard the testimony. In order properly to evaluate the factors moving in this entire unfortunate episode, it must be stated at once that Thomas was an ill man on the day he fell beneath the cobra touch of the carbon monoxide. For some time he had been under doctor's care because of arterio-arthritis and arteriosclerosis. On October 22, 1959 his physician, Dr. E. F. Conlin, instructed him to cease driving his automobile because his condition would not permit it. He told Thomas this in the presence of his step-daughter, Mrs. Davies and her husband, Carl E. Davies, and both immediately committed themselves to the task of providing Thomas with transportation every day. Thus, it is the most natural inference in the world that on the day of the crucial event of November 18, 1959, Mr. and Mrs. Davies were in the Thomas office in the late afternoon for the purpose of driving him home. While they were there, Thomas had a seizure and Dr. Conlin was called. The doctor treated Thomas and then left him under the care of the Davies. Dr. Conlin testified that Thomas had responded to his treatment and it was agreed between the doctor and the Davies that they would keep Thomas at the office for approximately an hour and then take him home. It was during this fate-laden hour that the carbon monoxide struck fatally.

Since the Davies were at the office of Thomas not only by invitation but in order to accomplish a certain mission for him, I do not understand on what basis the

Majority can call them "social guests" and thus place them in the class of mere licensees who cannot recover if they are injured because of latent defects on the premises of the landowner.

The record spells out a circumstantial situation which says clearly that the Davies were there for a purpose entirely unrelated to social activity. The most unfavorable conclusion that can be drawn against the plaintiffs from the facts is that the question as to whether they were invitees or licensees was a question of fact for the jury.

In the case of *Bowser v. Artman,* 363 Pa. 388, the plaintiff was injured when she fell with the collapse of a balcony on a fire escape from which she was viewing a parade. She brought suit against the owner of the building who contended she was a mere licensee and that therefore he owed her no duty with respect to an unknown dangerous condition. The record showed that the plaintiff had been invited to use the balcony by one of the tenants of the building, and this Court held that "it would be error to hold as a matter of law that plaintiff was a mere licensee." For what greater reason should the Davies not be considered mere licensees when the circumstances establish that they were not only invited to Thomas's office, but they were there to accomplish a definite task for him?

And then there is the case of *Jones v. Pa. Coal and Coke Corporation,* 255 Pa. 339, which I submit could well resolve the issues in this appeal. In that case a severe electrical storm injured an employee of the defendant company which operated a coal mine. The employee's son summoned a doctor who, while on the defendant's property, turned to a telephone to obtain additional medical assistance for the injured employee. As he picked up the telephone, an electric current struck him down inflicting serious injuries. He sued the company, charging it with negligence in the con-

struction, maintenance and operation of its high power lines and telephone lines. The defendant company resisted liability on the basis that the plaintiff was a "mere licensee on the premises" and that the "defendant had no knowledge, either express or implied, that the premises were in a dangerous condition, had no time to repair, and did not know that Dr. Jones contemplated going on the premises." The jury returned a verdict for the plaintiff which this Court affirmed, stating: "Holding, as we do, that Dr. Jones was an invitee on the premises at the time he was injured, it follows that it was the defendant's duty to keep the premises in a safe condition that he might not be injured while he was there professionally in response to the invitation."

What is the difference between a doctor being on premises for professional reasons and lay persons being on premises under the direction of a doctor, for the same purpose, namely that of saving life? The Davies were on the Thomas premises at the time they succumbed to the carbon monoxide gas because Dr. Conlin directed them to stay there to care for the ailing Thomas. To say that the Davies were not engaged in fulfillment of a duty and refer to them merely as "social guests" under the awesome setting in this case is to employ language indiscriminately.

If it be said that the Davies were not bound to obey the medical orders of Dr. Conlin, we will turn back to the *Jones* case where the defendant argued that the person who called Dr. Jones had no authority to summon a doctor. Mr. Justice MESTREZAT, brilliant jurist from Fayette County, in responding to this contention, trenchantly said: "We will answer the question in the language of Judge COOLEY in Marquette & Ontonagon R.R. Co. v. Taft, 28 Mich. 289: 'We shall not stop to prove that there is a strong moral obligation resting upon anyone engaged in a dangerous busi-

ness, to do what may be immediately necessary to save life or prevent an injury becoming irreparable, when an accident happens to a person in his employ. We shall assume this to be too obvious to require argument.' "

I shall also assume that it is too obvious to require argument to answer the assertion that the Davies were mere "social guests" when the evidence shows that they were engaged in the most necessitous duty that can confront man, the duty to care for him who has been stricken and not to leave the brother who has fallen by the wayside.

The Majority Opinion says also: "Nor does the fact that a social guest performs some *minor* or *incidental* service for his host during his stay convert the status to that of 'business visitor.' " (Emphasis in Majority Opinion.)

Is caring for a person felled by a heart attack a "minor or incidental service?" Is the nursing of a person under conditions which are perilous to life a "minor or incidental service"? Is the whole-hearted giving of one's physical energies, mental preoccupation, solicitude, thoughts and worry to the needs of the disabled and wounded a "minor or incidental service"?

In support of its statement that the plaintiffs may not recover because the Davies were engaged in some "minor or incidental service," the Majority cites the case of *Murrell v. Handley*, 96 S.E. 2d 717, where the services rendered were indeed minor and incidental. The wife of the defendant asked him to bring her a pair of scissors. The plaintiff volunteered to fetch them. While doing so she slipped on a waxed floor and was injured. The Supreme Court of North Carolina properly held that she had no legal action against the landowner. But how can so trivial a chore as obtaining scissors for a sewing job be compared with what happened in this case where Carl and Mary Davies were rendering a service to prevent the scissoring of the

silver cord of the life of the landowner Fred Thomas?

The Majority Opinion also cites the case of *Dotson v. Haddock*, 278 P. 2d 338, where the Supreme Court of Washington declared that "before a person may attain the status of an invitee, it must be shown that the business or *purpose* for which the visitor comes upon the premises is of *material* or pecuniary benefit, actual or potential, to the owner or occupier of the premises." (Emphasis supplied.) Could anything be more *material* to the owner of premises than continuing to live? Could the purpose for which the Davies were on the premises of Thomas reach a higher dignity of correctness than being there to render aid to a man who had been laid low by a heart attack?

Not one of the cases cited by the Majority in the matter here under discussion supports the conclusion finally reached by the Majority. As a matter of fact, where they are relevant, the cases quite clearly justify the opposite conclusion. *McHenry v. Howells*, 272 P. 2d 210, is in point. It actually expounds rules which substantiate the contention of the plaintiffs here. In that case the plaintiff was injured when she fell down steps in the defendant's home where she was a guest. Although she had traversed the steps a number of times she fell only because she thought she had reached the bottom of the staircase when in fact she still had two steps yet to go. The Supreme Court of Oregon naturally held that there could be no recovery in damages, but in doing so, it expatiated on the law in the cases of this character and said: "The defendants owed plaintiff the duty to use reasonable care not to injure her through any affirmative or active negligence on their part, as distinguished from passive negligence. They also owed her the duty of not willfully, wantonly, or intentionally inflicting injury upon her. As to plaintiff, defendants were subject to the rule of law that *liability of an owner or occupant of premises to a li-*

censee may be predicated upon negligence in leaving something in the nature of a trap or pitfall at a place where his presence might have been anticipated, without a warning thereof. 'A "trap," within the meaning of this rule, is a danger which a person who does not know the premises could not avoid by reasonable care and skill.' 65 C.J.S., Negligence, §38, p. 503." (Emphasis supplied.)

In this case Carl and Mary Davies were invited into a "trap." In the words of the case just cited, the Davies entered into a danger which they "could not avoid by reasonable care and skill." Thomas had the unrelinquishable duty to inform his invitees of the death trap in his office. The fact that he himself was not aware of the living morgue in which he was maintaining his place of occupation is no excuse. It was his duty to know. It was his duty to take the precaution which would have informed him of the fatal atmosphere in which he held forth.

I call attention again to the case of *Jones v. Pa. Coal and Coke Co.*, 255 Pa. 339, where we stated in no ambiguous manner the duty fastening upon a landowner to know of perilous situations on his land and if he makes no effort to discover and do away with "traps," he becomes liable for damages resulting therefrom regardless of his lack of positive knowledge. This is what we said in the *Jones* case and this is what we should say here: "There is no merit in the defendant's contention that there can be no recovery because it had no knowledge or notice that the premises were in a dangerous condition and no time to repair, and did not know that plaintiff contemplated going on the premises. The negligence complained of in the statement and shown by the evidence was the defective construction of the power and telephone lines and the failure to provide safeguards to prevent a broken uninsulated power wire falling upon the telephone wire. *It is,*

*therefore, immaterial whether the defendant knew of the fall of the wire or had time to replace it."* (Emphasis supplied.)

But even if the Davies were not invitees and were only licensees as the court below assumed and as the Majority of this Court has affirmed, there was still sufficient evidence in the case from which the jury could find that Thomas knew or should have known of the gaseous pitfall on his property and was, therefore, under a duty to warn those who might come upon his property, or to do something to abate the danger.

Thomas was charged with the responsibility of keeping his property in a safe condition for people legitimately coming there, especially those coming there to perform important services for him. Certainly if an invitee who comes upon premises for his own commercial advantage as well as that of the property owner is entitled to a reasonable inspection of the premises by the property owner, then one who enters upon the premises for the sole purpose of rendering assistance to the property owner who is ill is entitled to an equally reasonable inspection for his safety. It offends against reason and logic to hold that such a person is to be regarded as a mere gratuitous licensee.

In the *Bowser v. Artman* case, supra, we said: "The undisputed evidence shows that the collapse of the fire escape was caused by the rusted condition of the I-beam which supported it and also of the bolts and rivets which held it together. It was also proven that *those conditions would have been disclosed had defendants made a proper inspection."* (Emphasis supplied.)

If Thomas had made an inspection of his gas furnace, even only a cursory inspection, he would have discovered the rusted and corroded damper which turned the gas into a current of death. If he had bestowed a serious moment on the working of this device with the potentialities of causing death, if he had asked

the gas company to send someone to look at the damper the tragedy in this case would have been averted.

No matter how one looks at this case, it seems to me that the conclusion is inescapable that Thomas had the unshakable duty of maintaining his furnace free from any latent defect which would be discovered by reasonable inspection. In the *Bowser* case this Court emphasized that the defendants had the "duty of maintaining the fire escape free from any latent defects which would be discovered by reasonable inspection."

The Majority Opinion says that "There is not a scintilla of evidence herein to establish that the deceased, Thomas, had any previous knowledge of the existence of the latent dangerous condition upon which the cause of action is based."

"Scintilla" means *spark*. Not only *is* there a spark of evidence to establish Thomas's responsibility in this fatal occurrence, but the record is a conflagration of proof that Thomas was negligent in not ascertaining what it was his duty to know. We have seen in the *Jones* and the *Bowser* cases, that the test is not whether the landowner actually inspected his premises for latent dangers, but whether there was a duty on his part to do so. We will repeat what this Court said in the *Jones* case in this regard: "There is no merit in the defendant's contention that there can be no recovery because it had no knowledge or notice that the premises were in a dangerous condition and no time to repair, and did not know that plaintiff contemplated going on the premises. The negligence complained of in the statement and shown by the evidence was the defective construction of the power and telephone lines and the failure to provide safeguards to prevent a broken uninsulated power wire falling upon the telephone wire. *It is, therefore, immaterial whether the defendant knew of the fall of the wire or had time to replace it.*" (Emphasis supplied.)

Is this Court altering the law so specifically stated in the *Jones* case? There was a time when the law was devoid of feeling and had but little regard for the idealistic motivations of mankind, always struggling toward an authoritative universal application of the golden rule. Hard inflexible rules were laid down so as to maintain the status quo, always in behalf of those who had most of everything and against those who had little or nothing.

The law has changed considerably since that sad period in the history of the human race. It has left behind it the stony bottoms of economic subserviency to baronial and ducal proprietorship, a status not much better than outright slavery, and it has advanced to a plateau where it now recognizes the demands of humanity and good sense as being part of established jurisprudence. That progress has been vividly apparent during the last century or two. This is no time to retreat from that advanced position.

If the law is to be changed its amendment should always be along the lines of an even closer approach to natural and self-expressing justice, a justice which is recognized by even those who never saw a law book. The law should never retrograde to that period of medieval rationalization which had but one objective and scope and that, as indicated, was to glorify and perpetuate existing inequalities.

I see it as medieval rationalization to say that a landowner can be held responsible for devices capable of doing harm only if he is aware of those devices when he deliberately closes his eyes to dread hazards at his feet. If a landowner is informed of the possibility that a poisonous snake is ambushed in the shrubbery of his garden and he does not beat the bushes to locate and suppress the peril, he is liable for the damage done to anyone who comes upon his property and is bitten by the reptile. This is so fundamental a law that no

formal precedent is required to be cited to support it. The law of self-preservation means not only saving one's own life but saving as well the lives of those who come within one's sphere of protection.

Let us now examine the record, not to point out the scintilla the Majority cannot find, but to observe the crackling flames of alarm which Thomas ignored and, by doing so, brought death to his step-daughter, irreparable harm to his benefactor Carl Davies and took him to his own grave prematurely.

Thomas obviously was aware of the gas furnace in his office. Dr. Conlin was also aware of it and he had misgivings about it. He was concerned that the furnace might release fumes which would do harm to Thomas and accordingly warned him to *inspect the furnace!*

This is his testimony: "At the time, I suggested since the winter months were coming that he should have his *furnace or heating system checked, because any fumes might irritate him.* Since his office was located in a flood zone, I thought his *heating system should be checked, as any fumes* from his heating apparatus could be irritating, and it could precipitate this attack as well as his work or any excitement could precipitate an attack." (Emphasis supplied.)

Could anything be more specific and more relevant to the evolution of the tragedy than this? Dr. Conlin tells Thomas to have the furnace checked because the furnace might release *fumes* and Thomas ignores this warning. Was this not negligence? The fact that his failure to check the furnace would endanger his life was bad enough, but not to check the furnace and thus endanger the lives of others was negligence in an extreme degree. But the evidence of his negligence is even worse than this. Not only did he not check the furnace against fumes, but he stuffed rags around the doors and windows to bar the cold wind from the river,

and by doing so he kept out the fresh air which could have diluted the potency of the carbon monoxide.

Do we not have here a clear-cut case for the jury on the question of negligence?

The Majority Opinion says: "The determinative issue is: Was the proof at trial legally sufficient to warrant the submission of the question of negligence to the jury? In evaluating the testimony in this respect, the record must necessarily be read *in the light most favorable to the plaintiffs' cause.*" (Emphasis supplied.)

It does not seem to me that the Majority has so read the record, because the record, even without the favoring light to which the Majority adverts, speaks out boldly for a jury determination. Denying the plaintiffs that determination is to deny them fundamental justice as written into current law. Denying them that determination is to repudiate stare decisis. Denying them that determination is to penalize them for responding to the highest duty known to mankind, that of assisting others in mortal danger. There is no superior duty to this, whether it be written in a code, emblazoned in statutes, or proclaimed through court decisions. This is rudimentary, fundamental, natural law. A world of people could not exist without it. It is the basis of every system of jurisprudence, it is the heartbeat of government, it is the breath of the nostrils of organized society.

It would be regrettable enough if the Majority's decision were based on a technicality. To surround the temple of the law by a fence barbed with the spear points of technicalities, meaningless abstractions, and empty formalisms would indeed be deplorable. But the Majority's decision fails in a graver degree than this because even the technicalities of the law favor the determination of this cause by the fact-finding tribunal established by the Constitution for resolving just such issues.

The precedents of this Court and the law of the land invite Carl Davies and the administrator of the estate of his dead wife into that tribunal. Since the Majority of this Court has closed that door to these legally-deserving plaintiffs, I must note a vigorous Dissent.