465 A.2d 1306

**Jack E. FISHER and Constance Fisher, Husband/Wife, Appellants**

v.

**John R. FINDLAY and Helen Findlay, His Wife.**

Superior Court of Pennsylvania.

Argued April 12, 1983.

Filed Sept. 23, 1983.

Petition for Allowance of Appeal Denied Feb. 2, 1984.

Warren D. Utermahlen, Milford, for appellants.

Lucille Marsh, Scranton, for appellees.

Before HESTER, MONTEMURO and POPOVICH, JJ.

HESTER, Judge:

This is an appeal from the Order of February 11, 1982, in the Court of Common Pleas of Pike County, affirming the Order of May 22, 1979, granting a compulsory nonsuit.

■ When reviewing the issue of whether a compulsory nonsuit should have been granted,

"Plaintiff must be given the benefit of every fact and every reasonable inference of fact arising from the evidence, whether direct or circumstantial, and all conflicts must be resolved in the plaintiffs favor. *McDonald v. Ferrebee*, 366 Pa. 543, 79 A.2d 232 (1951). A compulsory nonsuit may be entered only in a clear case where the facts and circumstances lead unerringly to but one con-

clusion. *McNett v. Briggs*, 217 Pa.Super. 322, 272 A.2d 202 (1970)." Cited in *Jurich v. United Parcel Service of New York, Inc.*, 239 Pa.Super. 306, 361 A.2d 650 (1976).

Reviewing the evidence in accordance with the above-quoted law, the evidence adduced at trial is as follows:

On June 27, 1975, at approximately 8:00 p.m., appellant Jack Fisher arrived at the appellees' residence while they were having dinner. He joined them at their table. Following his arrival, the parties sat down to dinner. Approximately five or ten minutes thereafter, husband/appellant requested to use the restroom. Appellant, being unfamiliar with the appellees' house, inquired of appellee for directions. Appellee, John Findlay, testified that he gave appellant the following directions: "I walked him to the living room and showed him where the hallway was and I told him the light switch was on his left." However, there are no light switches on the left side of the hallway. The testimony concerning what appellant would have encountered in following appellee's directions is as follows:

Q. Appellants' Counsel: Now, as you turned left in that particular hallway are there any light switches which would be found or located on the wall on your left?

A. Appellee John Findlay: No, sir.

Q. Where is the first light switch on your left as you enter that hallway?

A. When you walk through the bathroom door.

Q. Well, what is the first door that you reach as you turn left into that hallway?

A. The door to the cellar door, but there's a gate across it, always locked.

Q. The first door you would reach, then, is the cellar door?

A. Yes, sir.

Q. Now, is there a light switch located anywhere for that particular cellar?

A. When you open the door, yes, sir.

Q. And where is it located?

A. On the left.

Q. It's on the left?

A. Yes, sir.

Q. So as you turn left into the hallway the first door you come to is the cellar door, and the first light switch on the left is the light switch for the cellar, isn't that true?

A. After you open the door, yes, sir.

Q. Now, you had referred to a bathroom. The bathroom door is the second door, isn't it?

A. It's right straight ahead.

Q. Please, it is or isn't it the second door?

A. Yes, sir, the second door.

Q. Now, is that light switch located on an outside wall or is it located inside the bathroom?

A. Inside the bathroom.

Q. Now, did you tell Mr. Fisher at any time that the door to the bathroom was the second door?

A. No, sir.

Q. Did you tell him that the light switch that he was going to find on his left was the second light switch on his left?

A. No, sir.

Q. In order to get to the light switch which would be for the cellar you have to open the cellar door, is that correct?

A. Yes, sir.

Q. And for the light switch in the bathroom you also have to go into the bathroom, don't you?

A. Yes.

Appellant, upon entering the hallway, proceeded to the first door on his left and opening it inward, tumbled down the stairway. He was found by appellees, lying unconscious, on the cellar floor. Due to the seriousness of his injuries, appellant was unable to testify at trial.

The cellar door and steps were described by appellee Findlay as follows:

Q. Appellants' Counsel: Now, Mr. Findlay, in what direction does the cellar door in question open? Do you pull it towards yourself or—

A. Mr. Findlay: Pardon me? Repeat that question, please.

Q. What direct does the cellar door open?

A. Oh. Inwards. You have to open it, push it in.

Q. You push it in?

A. Yes, sir.

Q. Is there any landing at the top of those cellar stairs?

A. No, sir.

Q. Does the railing come up to the top of the steps?

A. No, sir.

Appellant's expert, James F. Knash, a professional engineer, testified as follows regarding the appellees' cellar door and stairs:

Q. Appellants' Counsel: Now, you referred before, Mr. Knash, to certain commonly accepted standards, engineering and architectural standards, which would apply to the construction, usage and design of cellar doorways and stairs. Now, what are those standards with respect to cellar doors themselves?

A. Mr. Knash: Well, these standards apply not only to cellar doors but to any door that opens to a set of stairs, there's usually a landing on top, which is required by most of the present day codes.

And, in other words, any time you open a door you have to—your body has to be in a motion to follow the door through. If you walk up to a door and try and open it standing still you can only get it to go as far as your hand will go, and that won't get it open, so you have to get your body in motion to follow through. And as you're following through with your hand on the knob your tendency is one of your feet to take a step forward, usually over the threshold. And because this is a natural

tendency of the body that is why they require landings on all doors that are opening out, so that that first step you will be landing at the same level that you're standing.

And if this isn't done then usually the door is made to open in the other direction. Because if you walk up to a door that is—you have to pull to open—your tendency is to stop, grab the handle and then you have to actually back up, so that the momentum of your body is going in the opposite direction then. And when you get the door open then usually you're hanging onto the knob, it stops your backward motion, and then you can proceed forward, because there's a tendency for the body to want to go and stay in the direction that it's moving.

Q. Now, you stated that this particular doorway opened outward. When you say outward you mean outward away from the body?

A. Away from the body, yes.

Q. Now, did you observe whether or not there was any landing on this particular doorway?

A. No, There was no landing.

Q. There was no landing whatsoever?

A. No landing, no.

Q. So in that regard is it your testimony that this cellar door did not conform to the commonly accepted standards of custom usage and design?

A. Yes. That door should have opened the other way. It should have opened towards the—the top of the—towards the hall. It should have opened into the hall.

Q. Now, did you continue to make observations with regard to the stairway?

A. Yes.

Q. All right, now, did you make any determination as to whether or not there was a railing located on those stairs?

A. There was a railing but it was at the bottom. It would be located—you had to get halfway down the stairs before you could grab it.

Q. Mr. Knash, is that railing indicated on your drawing?

A. Yes, it is.

Q. Could you perhaps hold the drawing up and show that to the jury?

A. Here's the railing and it is nailed to the side of the steps. This is a section through, it's nailed on this side. So if you were standing up here you would have to get down at least halfway before you could grab it here, at least that far down before you could even reach down and grab the railing. (Indicating)

Q. Let me show you Plaintiff's Exhibit No. 4 which is offered in evidence. If that the same railing that you observed at the time?

A. Yes, it is.

Q. All right, now, you stated that in order to reach that railing you would have to be halfway down the stairs?

A. Yes.

Q. Now, are there commonly accepted standards of custom usage and design with regards to railings in residential cellar stairways?

A. Yes. Railings should run clear to the top of the stairs so that as you take the first step you can grab onto a railing.

Q. So in that regard these stairs did not conform to those standards?

A. That's right.

\*    \*    \*    \*    \*    \*

Q. Now, are there commonly accepted engineering or architectural standards which would relate to either the width or height of risers?

A. Yes. Usually a set of stairs is classified as anything between twenty degrees and fifty degrees. If you go below that it's classified as a ramp. If you go above fifty degrees it starts to become a ladder, it's classified as a ladder.

And at these points that are called the critical angle is the transition between stairs and a ladder or stairs and a ramp because at that point the body is uncomfortable.

Q. When you're talking about the relationship between the risers and the treads you're now talking about the slope or the steepness of the stairs?

A. Yes. The ratio of the—of the riser to the tread determines the steepness.

Q. All right, now, did you make a determination as to the steepness of these particular stairs?

A. Yes, I did.

Q. And what was that determination?

A. They are 51 degrees, 42 minutes. And this is computed by dividing the riser height by the tread and you come up with a tangent of that angle.

Q. As a result of that computation what did you determine?

A. Well, by normal usage these are not stairs, they start to fall in the category of a ladder, because by normal usage fifty degrees is the critical angle.

■ Based upon this evidence, we must determine whether the evidence warranted the granting of a nonsuit. Here, we are presented with the two issues that are normal in this type of case: (1) Did the evidence establish negligence on the part of the appellees? (2) Did it establish contributory negligence on the part of appellant? Regarding the first issue, since appellant was a social guest of the appellees, he qualified for those duties owed to a "gratuitous licensee." *Davis v. McDowell National Bank,* 407 Pa. 209, 180 A.2d 21 (1962). In *Sharp v. Luksa,* 440 Pa. 125, 269 A.2d 659 (1970), these duties were declared to be contained in Section 342 of the *Restatement (Second) of Torts.* This section provides:

§ 342. Dangerous Conditions Known to Possessor

A possessor of land is subject to liability for physical harm caused to licensees by a condition on the land if,

(a) the possessor knows or has reason to know of the condition and should realize that it involves an unreasonable risk of harm to such licensees, and should expect that they will not discover or realize the danger, and

(b) he fails to exercise reasonable care to make the condition safe, or to warn the licensees of the condition and the risk involved, and

(c) the licensees do not know or have reason to know of the condition and the risk involved.

In the present case, it is undisputed that appellant had no reason to know of the steep stairway that appellants' expert stated would be classified as a "ladder" in the engineering profession. Also, a juror, after reviewing the appellants' photographs, could reasonably conclude that the steps were indeed more in the form of a ladder rather than steps in a staircase.

As to whether the stairway and door constituted an unreasonable risk of harm, appellants' expert testimony established that the door opened in the improper direction, and thus, appellant's own momentum carried him into the stairwell which resulted in appellant's fall. Further, the appellants' expert testimony classified the stairway as a ladder and not a stairway, and did not conform to the standards of engineering and architecture which apply to the construction, usage and design of cellar doorways and stairs.

Further, it is undisputed that the appellees knew or should have known of this condition since the staircase had been constructed sometime prior to the occurrence and appellees had positioned a children's gate at the cellar door. Also, unlike the directions given to the plaintiff in *Felix v. O'Brien*, 413 Pa. 613, 199 A.2d 128 (1964), the directions in the present case were more specific, as appellee John Findlay stated:

"I walked him [appellant Jack Fisher] to the livingroom and showed him where the hallway was and I told him the light switch was on his left."

Here, the jury could conclude that these directions were sufficiently specific to mislead appellant, for appellee Findlay also testified that there were no light switches on the left side of the hallway, and the first door on the left was the cellar door. Unlike *Felix v. O'Brien, supra*, there is

sufficient evidence, based upon appellants' expert testimony and photographs, for the jury to conclude that the appellees would have had reason to believe that appellant would not have been able to discover the dangerous stairwell.

■ We must now determine whether appellants are to be barred from recovery due to the contributory negligence of appellant Jack Fisher.[1] The lower court found him guilty of contributory negligence as the result of his entering a totally dark area (the stairwell). However, nothing appears of record to substantiate this finding. The only evidence as to the degree of light in the stairwell at the time of the accident is to the effect that it was still light out doors and that a large window filters light into the hallway. Thus, the jury could reasonably infer that the stairwell was semi-light or light. Therefore, appellant would not be contributory negligent as a matter of law. *See Hoss v. Nestor Building & Loan Association,* 164 Pa.Super. 77, 63 A.2d 435 (1949); *Mogren v. Gadonas,* 358 Pa. 507, 58 A.2d 150 (1948).

However, we are of the opinion that it is a jury question whether the appellant had time to realize the lighted condition of the stairwell since appellants' expert testified that immediately upon pushing open the door, appellant's momentum would have propelled him into the stairwell.

■ The question of appellant's contributory negligence is for jury resolution.[2]

Reversed and remanded for a new trial. Jurisdiction is relinquished.

1. Since the instant cause of action arose prior to September 7, 1976, the effective date of the Comparative Negligence Act, the law of contributory negligence, rather than that of comparative negligence, is to be applied. See *Costa v. Lair,* 241 Pa.Super. 517, 363 A.2d 1313 (1976).

2. Regarding appellees' questioning of the propriety of this appeal, whereas the law favors the right to appeal where an appeal has otherwise been timely made in good faith before the wrong court, we hold that this appeal is proper for review. See *Commonwealth v. Carter,* 36 Pa.Cmwlth. 569, 575, 389 A.2d 241, 242 (1978).