Weisman, Appellant, *v.* Sauder Chevrolet Company.

Argued November 17, 1960.   Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

*John W. Beyer,* with him *Arnold, Bricker, Beyer & Barnes,* for appellant.

*Ralph M. Barley,* with him *John C. Pittenger,* and *Barley, Snyder, Cooper & Mueller,* for company, appellee.

*Robert E. Porter,* with him *Greenwell, Porter, Smaltz & Royal,* for appellees.

*W. Hensel Brown, Jr.,* and *Brown & Zimmerman,* for additional defendant, appellee.

OPINION BY MR. JUSTICE MUSMANNO, January 16, 1961:

Clayton H. Martin was killed in his car which was being towed by an automobile of the Sauder Chevrolet Company. The administrator of his estate brought death and survival actions against the Sauder Chevrolet Company, which brought in as an additional defendant Kathryn A. Mauer, the driver of the car which

collided with the Martin car. At the trial the Court of Common Pleas of Lancaster County entered a compulsory nonsuit against the plaintiff, and the plaintiff appealed.

In considering the removal of a nonsuit we are to read the record in the light most favorable to the plaintiff and allow to the plaintiff the benefit of all inferences logically and fairly rising from the evidence presented in his behalf. Applying that standard of review to the record, the lower court would have been justified in concluding that the accident happened in the following manner and, that being so, it should have stayed its decision of nonsuit.

On January 12, 1959, Clayton Martin informed Robert I. Buckwalter, service manager of the Sauder Chevrolet Company in Manheim, that his car, a Chevrolet, had broken down in Liverpool, Mifflin County, and requested Buckwalter to repair it. Buckwalter agreed to perform the work and set off for Liverpool in his car (a Buick) with Martin. In Liverpool Buckwalter made some temporary adjustment to the disabled Chevrolet and Martin was able to drive it under its own power as far as Harrisburg. At this point, however, it became apparent that the disablement was of such a character that the Chevrolet could no longer proceed independently. Buckwalter accordingly attached a 10-foot chain to its left forward bumper support and fastened the other end to the rear bumper support of his Buick.

All apparently went well for some 20 to 25 miles, but as dusk set in and the road began to darken, something apparently happened to the steering gear. In any event, the Chevrolet did not follow the Buick in a direct line. It wove and swayed from one side of the road to the other as it slavishly responded to the tug on the chain. The cars had now reached an elevation

on the Route 72 they were traversing, known as Bismarck Hill where the road drops and curves and, continuing on a downgrade, proceeds through woods to a point known as Hull's Tavern. Martin and Buckwalter took the descent at a speed of from 35 to 40 miles an hour.

Route 72 in this area consists of two lanes—one northbound and the other southbound—so that to leave one lane means invading the other where the traffic moves in the contrary direction. While still on the descent in the southbound lane, the Chevrolet swung sharply to the left into the northbound lane; it then veered drastically to the right, reaching the verge of the macadam; and then again shot across to the northbound lane. While all this was happening Buckwalter seemed to be deaf, dumb and blind to the turbulence behind him. Finally, toward the end of the violent maneuvering of the Martin car, Buckwalter awakened to the fact that something was wrong. He testified: "All of a sudden I felt the chain pull the rear of my car to the left. I took a firmer grip on the steering wheel as the car being towed was supposed to be directly back of me and was not at the time I looked front."

However, it was now too late to arrest what was in the tragic making. On the second veering to the left, Martin headed directly into the path of a car coming in the opposite direction. The inevitable collision was head-on, and Martin was killed instantly.

At the trial, the plaintiff offered as an expert witness E. Paul Brill for the purpose of showing that Buckwalter was negligent in the manner he prepared for and conducted the towing job. Brill was an expert tower having been in that business for 20 years with a record of having towed some thousand cars a year. When asked by defendant's counsel for an offer, plaintiff's counsel said that he wished to question the wit-

ness on proper towing methods, on the speed at which towing cars should travel generally, and, particularly, in this case, considering local conditions, topography, nature of the road, and state of the disabled car.

Under questioning by the judge the witness stated that during the preceding 15 years he had never used chains for towing. The court regarded this as a particular disqualification in the case and sustained defendant's counsel's objection to Brill's testimony. However, the court felt that expert testimony on towing was incompetent in any event, regardless of method employed. In its formal opinion sustaining the nonsuit, the court said: "Regardless of whether the witness qualified as an expert, in our opinion the proposed testimony was inadmissible for the reason that the circumstances were such that no special knowledge or training was necessary to determine intelligently the question of negligence . . . Everyone of average intelligence would know that there are some hazards involved in towing a car by chain and it does not take an expert to explain that there are safer methods. Nor does it take a person with special knowledge or training to explain what is a safe speed for towing a car by chain. The jury is just as capable of determining what is a safe speed for a car being towed as it is for a car traveling alone."

Whether expert testimony should be accepted in any given trial is generally within the discretion of the trial judge, as the lower court properly said. However, that discretion is subject to review, and in such a review we are constrained to decide that under the circumstances of this case, the trial court erred in disqualifying Brill.

Towing a car is an operation fraught with danger. The tower has as much a responsibility as a guide leading a stranger over a mountain pass. If the guide him-

self is not familiar with the topography or is indifferent to obstacles, changing weather and visibility conditions, he may carelessly walk his helpless ward over a precipice.

The difference in towing speed, for example, between twenty miles an hour and forty miles an hour, considering road, light, personnel, and cars, could be the difference between safe travel and mortal accident. Science and general observation would not support the trial judge's statement that the average person would know what is the safe speed for towing a car by chain. Nor can we be certain that all jurors would know the safe speed for a car under tow generally.

Not all jurors are automobile drivers, and even those who are, may fortunately never have had the distressing experience of being helplessly pulled along in a crippled car by a car ahead whose driver does not always keep a cautious eye on what is happening in the rear. It should be apparent that many technical factors might enter into a proper determination as to whether a disabled car should be towed by chain or cable. Indeed the jury might be called upon to decide whether it would not be negligence on the part of the tower, under certain circumstances, to have a person in the towed car at all. It is obvious that in the event the connecting cable or chain between the towing car and the towed car should break, the passenger in the rear car would be utterly at the mercy of whatever traffic should be in his immediate vicinity. Certainly a tower in the event of such an eventuality should be required to show that he exercised good judgment in carrying a passenger in the towed car and that he exercised a high degree of care in the manner in which he connected up the two vehicles and conducted the transportation operation from beginning to end.

Did the defendant's driver here use the proper care in connecting up the two cars knowing that he had an

appreciable distance to travel, knowing that the high-way over which he would move had curves and grades and would have to penetrate through woods with their circumambient gloom, and knowing also that he could not accomplish the entire journey without having to travel some of the way at night when darkness added a hazard all its own?

It could well be that in all these circumstances the question as to what would be a safe speed would come within the peculiar competence of a towing expert.

The trial judge feared that if he allowed Brill, the expert witness, to testify, that his testimony would be contradicted by an opposing expert witness. He said that if Brill, for instance, testified that 25 miles would have been the maximum safe speed under the existing circumstances, the defendant could call an expert who might testify to a higher maximum safe speed. But a litigant in court may not be denied the right to produce what is perfectly competent testimony only because it is conjectured that the other side may then produce opposing testimony. If each side produces expert witnesses and even if their opinions clash, the jury is still more informed on the subject matter than if it received no advice at all and were required to render a decision in the dark chamber of ignorance.

Whether Buckwalter chose the right type of towing equipment, whether he proceeded at a proper speed, whether he should have more frequently checked the brakes on the towed car, whether he should have moved at all when the lights of the towed car failed, are all questions on which Brill could have supplied professional knowledge. Nor was the fact that Brill had not himself used towing chains in 15 years a reason for disqualifying him, since it was not denied that he had been in the towing business for 20 years. It would appear from the testimony that he ceased chain-towing

because he regarded chain-towing perilous. Suppose that a surgeon of 20 years experience had not for 15 years used ether in his operations because he found that it was injurious to the patient. Would that disqualify him from testifying as to why he regarded ether an improper method for anaesthetizing patients?

In this age of ever-increasing specialization, there are few Aristotles who know everything on everything's every phase. Even the use of as simple an article as a pick may be the subject of expert testimony in a controverted case. We so ruled in *Churbuck v. Union Railroad Co.*, 380 Pa. 181, where Justice CHIDSEY said: "The average person of ordinary intelligence knows the function of a pick but it may not be assumed that such knowledge extends to its varying use under all circumstances. Nor may it be assumed that any of the men and women jurors in the present case, much less all of them, knew the likelihood of a chip flying if a pick was brought down hard on a steel rail, and this was a matter that bore directly on the question of foreseeability by Kelley in determining the issue of negligence."

In *Schell v. Miller N. Broad Storage Co.*, 157 Pa. Superior Ct. 101, 109, the Superior Court approved the use of expert testimony on the subject of the proper closing of fire doors in a warehouse: "The laymen composing the jury could deduce, as we have demonstrated, that the doors had not closed because they had become defective, but, without a further explanation by someone who was familiar with the operation and maintenance of automatic fire doors, they could hardly be expected to know the precise part of the complicated mechanism which failed to function. This is a matter requiring technical knowledge, acquired by study and observation, and the opinion of an expert is admissible in such circumstances."

In the case of *Corbin v. Haws Refractories Co.*, 277 Pa. 126, 132, a witness testified that in his opinion a river boat, which had sunk, carrying to their death a number of passengers, had been dangerously over-crowded. This Court held that such expert testimony was in order: "It is, however, urged that since the attending circumstances could be adequately described, the expression of any opinion as to the carrying capacity of the boat was unjustified, but, in our view this contention is not tenable . . . The known facts could be narrated by the witnesses, but the conclusion to be drawn from them was properly the subject of expert testimony."

The lower court apparently sought to place the blame for the accident on the decedent by saying: "The decedent had three opportunities to complain about the method of towing during the three stops made after the tow began, but each time the journey home continued without any change in the tow or the manner of operation."

In point of factual accuracy only two stops were made after the tow began: one at Sutliff's Chevrolet, near Harrisburg, and the other as the motorists by-passed Hershey. However, passing up the number of stops, the imputation of responsibility to Martin (as a matter of law) for the accident can be disposed of very readily. In the first place, it is possible that Martin *did* complain about the towing operation. He could not testify to any such complaints, if made, because he was dead at the time of the trial, and it certainly is within the realm of possibility that Buckwalter would not volunteer having heard such complaint, if made, because such testimony would be for him an admission against interest. In the second place, there is the presumption that Martin used due care throughout the journey which resulted in his death. And then,

finally, it is possible and even probable that nothing untoward had happened before the Martin car swung into the wrong lane to warn Martin that chain towage was a mortally dangerous operation.

While the plaintiff had the right to use Brill, or any other properly qualified expert witness on towing, the record does not justify the entry of a compulsory nonsuit, regardless of expert testimony. It would seem that the trial judge himself was in doubt about this because he said he would not permit the jury to guess as to whether the defendant was negligent and then said later on in his formal opinion that the jury was capable of deciding the issue in the case without the benefit of expert testimony.

The responsibility of the driver of a towing car is as binding in law as it is uncomplicated in factual determination. He is simply required to use the care dictated by the circumstances. As solicitous as is the law in demanding that the driver of any car be vigilant every moment that he is at the wheel, it follows naturally that the law should be twice as solicitous about the driver who is in effect driving two cars at the same time. In so handling two cars, the driver must be as mentally alert and as physically responsive to the exigencies of the situation as a western cowboy has to be riding two horses in bareback Roman fashion.

In *Dobb v. Stetzler*, 369 Pa. 554, 558-9, a person sitting by the roadside was injured when a wheel detached itself from a car which was being towed, bounded forward and struck him. He brought suit against the owner of the towing truck. The trial judge entered a nonsuit. We reversed, holding: "A duty rested upon Mitchell [driver of the tow truck] to so manage his tow truck and the towed vehicle as to avoid unreasonable risk of harm to those lawfully using the highway, or to persons near thereto. What this Court said in

Delair v. McAdoo, 324 Pa. 392, 188 A. 181, as to the duty that an operator of an automobile owes to others, applies equally well to one towing a disabled vehicle. There, Mr. Chief Justice KEPHART said (at p. 395): 'Generally speaking, it is the duty of one operating a motor vehicle on the public highways to see that it is in reasonably good condition and properly equipped, so that it may be at all times controlled, and not become a source of danger to its occupants or to other travelers. To this end, the owner or operator of a motor vehicle must exercise reasonable care in the inspection of the machine and is chargeable with notice of everything that such inspection would disclose.' "

In further exposition, this Court said in that case that the driver of the tow truck, who was an experienced mechanic, should have been aware that if a wheel came off the towed car while it was in motion it could cause injury: "Under these circumstances a jury could conclude that Mitchell should have made an inspection of the right front wheel to determine whether it was properly fastened to the axle and that the mere bumping of that wheel by Mitchell with his leg or foot was not a reasonable inspection and that therefore he was negligent."

In the case at bar did Buckwalter test the brakes, the brake lights, the head lamps, the steering gear of the Chevrolet before he, in effect, made Martin a prisoner in the car and started on the long journey to Manheim? A witness, D. J. Hince, motorist who followed the Martin car for a mile before the crash, testified that at no time during this distance did Martin's brake lights appear, thus suggesting that the brakes themselves were not functioning. Commenting on this testimony, the trial judge said: "It is true that no brake lights were observed on the Martin car but the inference that Martin did not apply his brakes is just as reasonable as the inference that the car had no brakes."

But this comment ignores the rule that in contemplating a nonsuit the court should resolve all inferences in favor of the plaintiff. Observing that rule, it certainly is more reasonable to suppose that when Martin saw his car being swung into the contrary lane on the highway, where his very life would be endangered, he would almost instinctively apply his brakes rather than that he would allow himself inertly to be taken to his doom. And then, as stated, the plaintiff is entitled to the presumption that the deceased Martin exercised care to avoid being killed.

With regard to the head lamps the trial judge said: "It could be that the decedent had not seen fit to turn on the lights."

But this again is not a reasonable inference. Why wouldn't Martin turn on the lights for his own protection when it got dark, if the lights were in working order?

The lower court also said: "Nothing was said in the record to indicate that if the Martin motor had been running, the result would have been any different."

This is a wholly irrelevant observation. If the Martin motor had been running, there would have been no reason for it to be towed at all.

As to the additional defendant, there was no evidence produced at the trial that she contributed to the happening of the accident. At the retrial, however, the original defendant may offer testimony with regard to the actions of the additional defendant.

The judgment of nonsuit is reversed, and a new trial ordered.

Mr. Justice BELL dissents.

————

CONCURRING OPINION BY MR. JUSTICE BOK:

I agree with the reasoning and conclusion of the Majority opinion, but am unable to endorse the follow-

ing sentence: "As solicitous as is the law in demanding that the driver of any car be vigilant every moment that he is at the wheel, it follows naturally that the law should be twice as solicitous about the driver who is in effect driving two cars at the same time."

In terms of law I cannot tell what this means and what it does to the standard of care required of a towing driver. It also seems inconsistent with what immediately precedes it: is his duty of care that which is dictated by the circumstances, or is it doubled, and if doubled, how is it to be expressed when charging a jury?

Mr. Justice BENJAMIN R. JONES joins in this opinion.