440 A.2d 517

**Gerard LONG, District Attorney of Cambria County, Pennsylvania**

v.

**130 MARKET STREET GIFT & NOVELTY OF JOHNSTOWN, otherwise Known as 130 Market Street Novelties & Gifts, Inc., a/k/a 130 Market Street Novelties & Gifts of Johnstown, Inc., Being Names used by a Corporation Doing Business and Trading as Johnstown Novelty & Gift Shop and/or Adult World, David Dry, an Individual and Frank Cislo, an Individual, Appellants.**

Superior Court of Pennsylvania.

Argued April 9, 1979.

Filed Jan. 14, 1982.

384

386

James H. English, Altoona, for appellants.

J. Kiniry, Assistant District Attorney, Ebensburg, for appellee.

Before CERCONE, President Judge, and WIEAND and HOFFMAN, JJ.

CERCONE, President Judge:

We have before us today an appeal from an injunction which issued from the Court of Common Pleas of Cambria County. The final order of the chancellor, made pursuant to Pennsylvania's anti-obscenity statute,[1] permanently enjoined appellants from selling or distributing certain publications and films [2] which a jury determined to be obscene within the definition of the anti-obscenity statute.[3]

1. Act of 1977, Nov. 5, P.L. 221, No. 68, § 1, subsequently amended by the Act of October 16, 1980, P.L. 978, No. 167, § 2. 18 Pa.C.S. § 5903. For the recent amendments to the Act of 1977 see 4 Purdons' 1980 Legis. Supplement 877–78. The Amendments are not, however, pertinent here.

2. There are eleven publications and four films involved. The publications are: "Ero," "Je t'aime," "Violent Vixens," "Trio Sex," "Rim Jim Jim," "Photo Digest of Masturbation," "Orgy Too," "Hit and Fun," "Nurses Climax," "Hard 'n Ready Dudes," "Private." The films enjoined are: "Stallions," "Foxy Ladies-Human Card Table," "No Holes Barred," "Happy Hookers."

3. See 18 Pa.C.S. § 5903(b).

In addition to the materials submitted to the jury for its consideration, the injunction purports to enjoin the sale or distribution of films and publications of the same or substantially similar type. In this appeal, appellants allege error at trial, complain that the injunction is overly-broad and works a denial of their rights to free speech under the Commonwealth's Constitution as well as under the federal Constitution, and that the statute denies them their rights to equal protection under both Constitutions. With certain modifications, we affirm the order of the lower court.[4]

Gerard Long, District Attorney for Cambria County, filed a complaint in equity under the injunction provision of the aforementioned anti-obscenity statute, 18 Pa.C.S. § 5903(g), on April 4, 1978. At the same time he requested that a hearing be held within three days' time, as was his right under the statute. Appellants received timely notice of the hearing and filed a demand for a jury trial. On April 7, 1977, the day set for trial, appellants filed preliminary objections and a motion for a continuance, which were denied by the chancellor, whereafter a jury was empanelled and the case tried. The district attorney introduced eleven publications and four films into evidence, but offered no testimony concerning the contemporary community standards element of obscenity. During their case in chief appellants unsuccessfully attempted to have David Dry, himself a party, qualified as an expert witness to testify concerning the contemporary community standard on obscenity in Pennsylvania. In his summation, the District Attorney made two remarks, which appellants asserted in a motion for mistrial were highly prejudicial because of an allegedly inherent Christian, religious and moralistic slant. The mistrial motion was denied. The jury retired to deliberate, and returned a unanimous verdict, finding that all the material before it was obscene under Section 5903(b) of the Crimes Code. Thereupon the chancellor entered the order in question. On April 17, 1977, the lower court filed its memo-

---

4. Appellants have not raised any questions concerning the statute's vagueness. For this reason we need not discuss the due process question normally raised in cases of this type.

randum opinion setting forth at length events at trial and describing in detail the materials admitted into evidence and found by the jury to be obscene. On April 21 appellants filed motions for a new trial, a motion in arrest of judgment and a motion for dissolution of the injunction, the latter of which was amended on April 26, 1978. None of these latter motions was heard or considered because, by the terms of the statute, the order was final. On May 11, 1978, appellants took an appeal to the Supreme Court. The district attorney objected to the Supreme Court's jurisdiction. By per curiam order of June 26, 1978 the Supreme Court transferred the appeal to this Court. In the meantime, appellants had filed a petition for supersedeas, which we denied.

## I.

We consider first appellants allegations of error at trial. Initially appellants contend that the chancellor's denial of their motion for a continuance worked a denial of their rights to due process under the Fourteenth Amendment to the Federal Constitution. This Court has previously found the case of *Ungar v. Sarafite*, 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964), instructive on the due process argument appellants now raise. *Ungar v. Sarafite* involved a proceeding in which Ungar was served with an order to show cause why he should not be held in contempt for alleged willful and disruptive behavior during his testimony at the trial of one Hulan E. Jack, who was charged with conspiracy to obstruct justice. Ungar had five days' notice of his contempt hearing at which he appeared with counsel. Counsel asked for a continuance due to the fact that he was then in the midst of trying another case, and that he had had insufficient time to prepare Ungar's defense. The motion for continuance was denied on the grounds that five days' notice was more than sufficient time for Ungar to have retained an attorney who would have had no scheduled conflicts, and furthermore, that five days was sufficient time to prepare a defense. The court placed importance on

the fact that the motion for continuance had not been made until the time set for the contempt hearing. The U. S. Supreme Court affirmed the decision of the New York Court of Appeals confirming the lower court's ruling. Mr. Justice White, writing for the majority, stated:

> The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. *Avery v. Alabama*, 308 U.S. 444 [60 S.Ct. 321, 84 L.Ed. 377]. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. *Chandler v. Fretag*, 348 U.S. 3 [75 S.Ct. 1, 99 L.Ed. 4]. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied. *Nilva v. United States*, 352 U.S. 385 [77 S.Ct. 431, 1 L.Ed.2d 415]; *Torres v. United States*, 270 F.2d 252 (C.A. 9th Cir.); Cf. *United States v. Arlen*, 252 F.2d 491 (C.A. 2d Cir.)

*Id.* at 589–590, 84 S.Ct. at 849–850. We acknowledged *Ungar* in *Commonwealth v. Harding*, 245 Pa.Superior Ct. 333, 335, 369 A.2d 429, 430 (1976), a case involving a petition under Pennsylvania's Post Conviction Hearing Act, which questioned the trial judge's denial of a motion for continuance requested for the purpose of giving the defendant time to retain private counsel. We found apposite its teaching on the scope of review in a court's denial of motions for continuance. And, as we stated in *Commonwealth v. Simpson*, 222 Pa.Superior Ct. 296, 299, 294 A.2d 805, 806 (1972), "[a] continuance is a matter within the sound discretion of the trial court. *Commonwealth v. Richardson*, 392 Pa. 528, 140 A.2d 828 (1958)." Furthermore, we note that "[due] process is a flexible concept. What process is due depends upon the circumstances of each case, including the nature of

interests that are at stake and the particular proceeding in question. [Citations omitted.]" *In re Martorano*, 464 Pa. 66, 74, 346 A.2d 22, 26 (1974). The Pennsylvania Supreme Court has consistently held that mere shortness of time in which to prepare a defense does not violate the requirements of due process. *See Commonwealth v. Hill*, 450 Pa. 477, 301 A.2d 587 (1973); *Commonwealth v. Skipper*, 440 Pa. 576, 271 A.2d 476 (1970); *Commonwealth v. Woody*, 440 Pa. 569, 271 A.2d 477 (1970); *Commonwealth v. Berry*, 440 Pa. 154, 269 A.2d 921 (1970); *but see Commonwealth v. Honeyblue*, 262 Pa.Superior Ct. 137, 396 A.2d 683 (1978), aff'd per curiam, 487 Pa. 409, 409 A.2d 834 (1979). The instant case falls in between the ten minutes notice of a probation revocation hearing we found constitutionally wanting in *Commonwealth v. Williams*, 254 Pa.Superior Ct. 202, 385 A.2d 979 (1978) and the five days' notice in *Ungar* which was upheld. In light of the teaching of the case law, and of the legislative determination that three days' notice is adequate time to prepare a defense to an injunction petition of this type, we cannot say that under the facts of this case the chancellor abused his discretion in denying the motion for continuance.

Appellants also complain of the chancellor's refusal to qualify David Dry as an expert witness regarding the then prevailing statewide community standard concerning obscenity. As Justice Musmanno stated in *Weisman v. Sauder Chevrolet Co.*, 402 Pa. 272, 167 A.2d 308 (1971), "[w]hether expert testimony should be accepted in any given trial is generally within the discretion of the trial judge.... However, that discretion is subject to review...." *Id.*, 402 Pa. at 276, 167 A.2d at 311. The scope of review of discretionary matters is limited to inquiry into the abuse of those discretionary powers. *See Albert v. Alter*, 252 Pa.Superior Ct. 203, 381 A.2d 459 (1977); *Piso v. Weirton Steel*, 235 Pa.Superior Ct. 517, 345 A.2d 728 (1975); *Thompson v. American Steel & Wire Co.*, 317 Pa. 7, 175 A.2d 541 (1934).

The offer of proof made was that Dry would testify as to his knowledge of sales of publications, photographs and films of a kind similar or identical to those items then before

the court. Appellants clearly intended to try to establish the statewide community standard based on the availability and marketability of pornographic materials in other parts of the Commonwealth. The attempt to qualify Dry as an expert witness was clever, however, the chancellor's stifling of it was not an abuse of discretion. The contemporary community standard element, necessary to establish the obscenity or lack of obscenity of published material is not concerned with the availability of the material, but rather with its acceptability. The fact that one can walk into an "adult book store" in some of the towns and cities of the Commonwealth and purchase a film or publication devoted, on the whole, to bestiality, sado-masochism, or any of a number of other often-questioned sexual predilections, by no means implies that the average Pennsylvanian would not find the subject matter appealing to prurient interests. The statewide availability of sexually explicit films and publications does not bespeak their acceptability. We find no abuse of the chancellor's discretion in refusing to qualify Dry as an expert witness.

On a related issue appellants contend that the district attorney failed to make out all of the elements of the offense of obscenity. They contend that there was insufficient evidence to put the question to the jury because the district attorney presented *no* evidence concerning the community standard element of the offense. The appellants' position reflects a prior holding of the Pennsylvania Supreme Court, aired in *Commonwealth v. LaLonde*, 447 Pa. 364, 288 A.2d 782 (1972). In *LaLonde* the Court stated that due process demanded expert testimony on the question of the contemporary community standard. *Id.*, 447 Pa. at 377, 288 A.2d at 789. *LaLonde*, however, is no longer the law in Pennsylvania. Following the United States Supreme Court's lead in *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446, 447 (1973) our Supreme Court expressly overruled *LaLonde* in *Commonwealth v. Rodgers*, 459 Pa. 129, 134–135, 327 A.2d 118, 121 (1974). Under *Paris Adult Theatre I, supra,* and *Rodgers, supra,* motion picture

films, printed publications and photographs themselves are enough evidence for a jury, in applying our statewide standard, to determine whether the average person would find the materials appealing to prurient interests.

 ■■■ Lastly, appellants assign as trial error the denial of their motion for mistrial following two allegedly prejudicial remarks by the district attorney during his summation. The district attorney twice gave reference to the well-known adage: "Better to light one candle than to curse the darkness." Appellants contend that its inherently religious implications, associated as it is with the Roman Catholic lay organization, the Christophers, prejudiced the jury. Our research reveals that the saying is a translation of an ancient Chinese—presumptively not Roman Catholic—proverb. Additionally, the court, in its jury charge, specifically instructed the fact finders to ignore their personal religious and moral beliefs, no matter how strongly felt, in reaching a determination. Thus, even if there had been prejudice, it was cured by the court's instructions. *See generally Commonwealth v. England*, 474 Pa. 1, 375 A.2d 1292 (1977); *Commonwealth v. Brown*, 444 Pa. 318, 322, 282 A.2d 364, 366 (1971).

## II.

 ■■■ Appellants' second general contention strikes at the injunction along two lines. They argue that because the injunction applies not only to those films and publications which were admitted into evidence and determined to be obscene by the jury, but also to materials of the same or of substantially similar character and kind, the injunction acts as a prior restraint on their rights to freedom of expression under both Article I, Section 7 of the Pennsylvania Constitution of 1874 and the First Amendment to the federal Constitution. Further, they argue that the injunction is vague and overbroad.

Article 1, Section 7 of our state Constitution reads:
The printing press shall be free to every person who may undertake to examine the proceedings of the Legislature or any branch of government, and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject being responsible for the abuse of that liberty.[5]

We recently decided the validity of an injunction similar to the one *sub judice*, in the case of *Brightbill v. Rigo, Inc.*, 274 Pa.Superior Ct. 315, 418 A.2d 424 (1980). *And see Commonwealth by Russell v. Gomes*, 281 Pa.Superior Ct. 301, 422 A.2d 179 (1980). We need not repeat in detail what we said there. We do note, however, that it is universally recognized "that the power of a State to suppress obscenity is limited by the constitutional protections accorded free expression and there is thus no power to restrict the dissemination of publications or films which are *not* obscene." *Brightbill v. Rigo, Inc., supra*, 274 Pa.Superior Ct. at 322, 418 A.2d at 427. *See William Goldman Theatres, Inc. v. Dana*, 405 Pa. 83, 173 A.2d 59 (1961); *Ranck v. Bonal Enterprises, Inc.*, 467 Pa. 569, 359 A.2d 748 (1976); *Commonwealth ex rel. Davis v. Van Emberg*, 464 Pa. 618, 347 A.2d 712 (1975). *Cf. Willing v. Mazzocone*, 482 Pa. 377, 393 A.2d 1155 (1978). We do not hesitate to strike out those portions of the injunction which purport to enjoin unadjudicated materials; *Brightbill* provides us with clear precedent in this regard.

Because we have modified the injunction to encompass only those materials actually found to be obscene by the jury

5. The final sentence of Article I § 7 is omitted above. It was declared contrary to the federal Constitution in *Commonwealth v. Armao*, 446 Pa. 325, 286 A.2d 626 (1972). That sentence read: No conviction shall be had in any prosecution for the publication of papers relating to the official conduct of officers or men in public capacity, or to any other matter proper for public investigation or formation, where the fact that such publication was not maliciously or negligently made shall be established to the satisfaction of the jury; and in all indictments for libels the jury shall have the right to determine the law and the facts, under the discretion of the court, as in other cases.

we need not consider appellants' vagueness and overbreadth arguments.[6]

## III.

Lastly, appellants request that we strike down the statute as violative of their rights to equal protection under the Commonwealth's Constitution[7] as well as under the federal Constitution. They contend, specifically, that the exemption from prosecution for violation of the Act which is provided to libraries, museums and historical societies by Crimes Code Section 5903(j) creates an unconstitutional class. 18 Pa.C.S. § 5903(j).[8] Before we consider the merits of the equal protection arguments our task is to determine what test we must employ in evaluating appellants' claims.

## A.

 It has long been accepted that the federal Constitution's guarantee of freedom of expression in the First Amendment was made applicable to the states by the Fourteenth Amendment's due process clause. *Gitlow v. New York*, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925); *Fiske v. Kansas*, 274 U.S. 380, 47 S.Ct. 655, 71 L.Ed. 1108 (1927); *Stromberg v. California*, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931); *Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). It is equally clear that obscenity is not

**6.** Appellants argue that the injunction is overly broad insofar as it applies to unadjudicated films and publications. The district attorney retorts that based on the view of appellants' business premises and evidence advanced at trial, that these materials are fungible. Though we agree this may be so in a business sense we cannot agree that fungibility is of consequence in a constitutional sense.

**7.** *See Kroger Co. v. O'Hara Twp.*, 481 Pa. 101, 116–117, 392 A.2d 266, 273–274 (1978); *Baltimore & O.R.R. v. Dept. of Labor & Industry*, 461 Pa. 68, 334 A.2d 636 (1975); *Bargain City U.S.A. v. Dilworth*, 407 Pa. 129, 179 A.2d 439 (1962). Pa.Const. of 1874, art. III, § 32, as amended 1967.

**8.** Appellants have not raised the due process argument that the terms of the exemption are vague.

protected by the First Amendment, since obscenity is not within the federal definition of speech. *Paris Adult Theatre I v. Slaton, supra; Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); *Kois v. Wisconsin,* 408 U.S. 229, 92 S.Ct. 2245, 33 L.Ed.2d 312 (1972); *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). Because obscenity is not protected by the federal Constitution, a state may create such classifications as necessary to effectuate the regulation of such materials' dissemination or publication, so long as the state has a legitimate interest in such regulation. The test on appellate review in such an instance is not the strict scrutiny afforded constitutional liberties, but rather the rational basis test.[9] Thus, when an equal protection claim based on the federal Constitution is presented in an obscenity case the question becomes whether the state has some rational basis for creating the classification. *See generally, Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976).

**9.** Under the federal Constitution there are three tests by which legislatively created classifications are measured in order to determine whether those classifications meet the muster of the Equal Protection Clause. The so-called "strict scrutiny test" is applied to those classifications affecting fundamental rights and liberties, or classifications which are "inherently suspect." *See San Antonio School Dist. v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *McDonald v. Board of Election,* 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969). There is an intermediate test which is applied to so-called "quasi-suspect" classifications, such as gender, which requires heightened scrutiny but not scrutiny as intense as that applied in cases involving fundamental rights or inherently suspect classifications. *See Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971); *cf. Royster Guano Co. v. Virginia,* 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920). *See also Califano v. Goldfarb,* 430 U.S. 199, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977) (invalidated social security benefits for widows, but not for widowers of deceased insured workers); *Schlesinger v. Ballard,* 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975) (upheld military regulation allowing promotion of men after shorter periods of service than required of women). The third test is the "rational basis" or "rational relationship" test. It is applied in those cases not involving fundamental rights, but involving legitimate governmental interests and classifications neither inherently suspect nor quasi-suspect. *See Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

## B.

A determination of the proper test to be applied under the Commonwealth's Constitution demands lengthier analysis since the extent and nature of the right to freedom of expression under that document has not been as extensively litigated as has the federal question.

 The Commonwealth's Constitution of 1776 guaranteed the right to freedom of expression in these words:

That the people have a right to freedom of speech, and of writing, and publishing their sentiments; therefore the freedom of press ought not to be restrained.

Pa.Const. of 1776, Declaration of Rights, Section 12.[10]

Historical research indicates that the liberty of unrestrained *publication* was viewed at the time as absolute. Cooley makes this point clear when he writes:

*It seems more than probable, however, that the constitutional freedom of the press was intended to mean something more then mere exemption from censorship in advance of publication.* Such censorship had never been general in the colonies: it did not exist at all at the time of the Revolution, and there was no apparent danger of its ever being restored. To forbid it, therefore, and especially just at a time when the people had been taking a larger share in the government into their own hands, and when the command would be laid on their own representatives, would appear to savor somewhat of idle ceremony. *But the history of the times shows that the people believed a*

10. The Constitution of 1776 contained two distinct parts: The Declaration of Rights and The Frame of Government. Section 46 of the Frame of Government made the Declaration of Rights applicable to the Frame of Government, thus essentially integrating the two parts of the Constitution. The Constitution of 1790, besides radically altering the method by which the people of the Commonwealth would govern themselves, formally integrated the two parts of the 1776 Constitution, making the Declaration of Rights an article of the Constitution rather than a mere preface to it. This integration of the Declaration of Rights and the Frame of Government creating a unified Constitution has been maintained ever since. Neither the Constitution of 1838, nor that of 1874, nor the major revision in 1968 have deviated from the model of the Constitution of 1790.

*right of publication existed which might be invaded and
abridged by oppressive prosecutions, and by laws which
admitted the liberty to publish, but enlarged beyond rea-
son the sphere of responsibility*; and the evils they feared
had no necessary connection with established or threat-
ened censorship.

T. Cooley, *The General Principles of Constitutional Law in
the United States of America,* 300 (3rd ed., 1898). (Empha-
sis added). The Constitution of 1776 did not address the
question of a person's responsibility for his utterances or
publications once they were made. The apparent absolute-
ness of the 1776 guarantee of freedom of expression and its
capability for abuse gave rise to an exemption from its
protection, for it soon became clear, that although the free-
dom of *expression* is arguably an absolute right, the right to
*protection from prosecution for abuse of the freedom* is a
limited one.[11] As early as 1788 the Supreme Court of
Pennsylvania stated:

> The true liberty of the press is amply secured by permit-
> ting every man to publish his opinion; but it is due to the
> peace and dignity of society to inquire into the motives of
> such publications, and to distinguish between those which
> are meant for use and reformation, and with an eye solely
> to the public good, and those which are intended merely to
> delude and defame. To the latter description, it is impos-
> sible that any good government would afford protection
> and immunity.

*Respublica v. Oswald,* 1 U.S. (1 Dallas) 319, 1 L.Ed. 155
(1788). The sentiment of the Supreme Court in *Oswald,* a
libel case, found its way into the Commonwealth's Constitu-

---

11. Cooley explains the constitutional guarantee thusly:
"The freedom of the press may therefore be defined to be the
liberty to utter and publish whatever the citizen may choose, and
to be protected against legal censure and punishment in so doing,
providing the publication is not so far injurious to public morals or
to private reputation as to be condemned by the common law
standards, by which defamatory publications were judged when
this freedom was thus made a constitutional right."
T. Cooley, *The General Principles of Constitutional Law in the United
States of America,* 302 (3rd ed., 1898).

tion of 1790. The latter guaranteed to every citizen the liberty to "freely speak, write and print on any subject, being responsible for the abuse of that liberty." Pa.Const. of 1790, art. IX, § 7. The wording under our present Constitution is identical to that in the Constitution of 1790. Pa.Const. of 1790, art. IX, § 7; Pa.Const. of 1874, art. I, § 7. In this way the guarantees of free speech and press, which Blackstone had set down merely as principles of the common law, became part of the bedrock of Pennsylvania's constitutional system. *See* IV *Blackstone's Commentaries,* 151–152.[12] Thus we see that under our Constitutions there are two distinct elements to the right to freedom of expression. The first, arguably an absolute right, guarantees to each citizen the freedom to make public whatever he may choose. The prohibition against the prior restraint of publication serves to protect the sanctity of this right.[13] The second,

12. On the liberty of the press Blackstone wrote:
"The liberty of the press is indeed essential to the nature of a free state, *but this consists in laying no previous restraints upon publications,* and not in freedom from *censure for criminal matter when published. Every freeman has an undoubted right to lay what sentiments he pleases before the public* ; to forbid this is to destroy the freedom of the press; *but if he publishes what is improper, mischievous, or illegal, he must take the consequence of his own temerity.* To subject the press to the restrictive power of a licenser, as was formerly done, both before and since the revolution, is to subject all freedom of sentiment to the prejudices of one man, and make him the arbitrary and infallible judge of all controverted points in learning, religion, and government. But to punish (as the law does at present) any dangerous or offensive writings, which, when published, shall on a fair and impartial trial be adjudged of a pernicious tendency, is necessary for the preservation of peace and good order, of government and religion, the only solid foundations of civil liberty. *Thus the will of individuals is still left free; the abuse only of that free will is the object of legal punishment.* Neither is any restraint hereby laid upon freedom of thought or inquiry: liberty of private sentiment is still left; *the* disseminating *or making public of bad sentiments, destructive of the ends of society, is the crime which society corrects. . . .* "
IV *Blackstone's Commentaries,* 151–152. (Emphasis added.); also quoted in *William Goldman Theatres, Inc. v. Dana,* 405 Pa. 83, 89, 173 A.2d 59, 62 (1961).

13. We need not express any opinion, indeed we do not do so, concerning the right to unrestrained publication. That question is not before us. Our discussion here is centered on the protection the

clearly a limited right, guarantees to the same citizen protection from prosecution arising from the exercise of the right of publication, except when those publications are, as Blackstone put it, somehow "destructive of the ends of society." *Id.* It would seem that the right to trial by jury, Pa.Const. Art. I, Sections 6, 7 and 9, protects the sanctity of this more limited right.

▮ Since the case of *Commonwealth v. Sharpless*, 2 S. & R. 91 (1815) the courts of Pennsylvania have assumed that the publication of obscenity was a crime indictable at common law, part of our received jurisprudence, and hence not protected from prosecution for abuse of the liberty of free expression.[14] We have found no authority in this Commonwealth that extends to obscene matter the limited right to exemption from prosecution or punishment for its publication, which right many other forms of expression enjoy under the second element of our Constitution's free speech guarantee.[15] Nor have we found authority in our case law

constitution provides once publication has been made. The discussion must not be construed to extend further than its topic, and we so limit it. We note only that on its face the right to publish would *appear* absolute, and hence that the right *is arguably* absolute.

**14.** *See also Barker v. Commonwealth*, 19 Pa. 412 (1852); *Commonwealth v. Blumenstein*, 396 Pa. 417, 153 A.2d 227 (1959); *William Goldman Theatres, Inc. v. Dana, supra; Commonwealth v. Rodgers*, 459 Pa. 129, 327 A.2d 118 (1974); *Commonwealth v. Van Emberg*, 464 Pa. 618, 347 A.2d 712 (1975); *Brightbill v. Rigo, Inc., supra.* And see T. M. Cooley, *General Principles of Constitutional Law, supra* at 302; *Rawle on the Constitution*, 124 (2nd ed., 1823); *III Story's Commentaries on the Constitution*, 732, 736 (1833).

**15.** Thus, the important question *in Pennsylvania* is not whether arguably obscene material is speech or nonspeech, but whether the particular exercise of free expression is protected from prosecution or subject to criminal penalty or not. Indeed, our exhaustive research has revealed no case which holds that obscene matter is not speech *under the Commonwealth's Constitution.* To the contrary, however, our cases have often stated that obscenity is not speech *under the federal Constitution. See Ranck v. Bonal Enterprises, Inc.*, 467 Pa. 569, 359 A.2d 748 (1976).

We need not determine whether obscene matter is speech within the definition of our Constitution since it is clear that even speech protected by the first part of our free speech guarantee is not protected from prosecution and punishment once it has been determined by a jury to constitute an abuse of the right to free expression.

which holds that matter cannot be enjoined from *further* publication once it has been determined to be offensive, where that determination has been made by a jury applying a definition of obscenity the vagueness of which is not contested. *Cf. Buffalo Branch Mut. Film Corp. v. Breitinger,* 250 Pa. 225, 95 A. 433 (1915); *Commonwealth v. Rodgers, supra.* [16]

█ It follows therefrom that there is in Pennsylvania no fundamental right to protection from prosecution for the publication of matter abusive of the right to free expression,

**16.** We note, however, that there are two rather troublesome cases in the books, but we believe them both distinguishable. The reason these two cases appear troublesome is that on first blush they appear to forbid the courts of the Commonwealth from enjoining the further publication of matter adjudicated offensive. *See William Goldman Theatres Inc. v. Dana,* 405 Pa. 83, 173 A.2d 59 (1961); and see *Willing v. Mazzocone,* 482 Pa. 377, 393 A.2d 1155 (1978) reversing *Mazzocone v. Willing,* 246 Pa.Superior Ct. 98, 369 A.2d 829 (1977) (opinion per Cercone, J.)

Reading all the opinions filed in both *William Goldman Theatres* and *Mazzocone* we must conclude that the reason the statute in the first case, and the injunction in the second case, were struck down was because the determinations were made, in the first instance by the Board of Motion Picture Control, and in the second instance by the court, *and in neither instance by a jury.*

Indeed, until *Commonwealth v. Armao,* 446 Pa. 325, 286 A.2d 626 (1972) there was a provision in Art. I, § 7 of the Pennsylvania Constitution of 1874 which read:

"... No conviction shall be had in any prosecution for the publication of papers relating to the official conduct of officers or men in public capacity, or to any other matter proper for public investigation or information, where the fact that such publication was not maliciously or negligently made shall be established to the satisfaction of the jury; and in all indictments for libels the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases."

The Supreme Court of Pennsylvania struck down the foregoing as violative of the federal Constitution as illuminated by the leading cases of *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (required clear and convincing evidence of actual malice—actual knowledge of falsity or reckless disregard for truth or falsity—and not mere negligence with regard to the truth or falsity of the alleged libel) and *Garrison v. Louisiana,* 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) (invalidated a Louisiana statute which imposed criminal penalties for publication of true but inflammatory statements made with malice). The stricken part of the

*viz.* obscene matter. In short, obscenity does not enjoy the full protection of Art. I, § 7 of the Pennsylvania Constitution of 1874.

It is now clear that the test to be applied in equal protection cases neither implicating rights fundamental under the Commonwealth's Constitution nor involving suspect classifications, is the "rational basis" test.[17] The confusion which had arisen around the purported distinction between the "rational basis" test,[18] and the so-called "fair and substantial relationship" test,[19] was laid to rest recently in *Snider v. Thornburgh*, 496 Pa. 159, 436 A.2d 593 (1981).[20] Writing for the Court Chief Justice stated:

> We conclude that the mistaken assumption that the phrase "rational basis" implies a greater assumption of constitutionality or connotes a less strict standard of review than the phrase "fair and substantial relation", should be discarded. Accordingly, we proceed to analyze the classification at issue here to *determine whether it is*

Constitution was neither attacked nor invalidated because of the jury's role in deciding libel cases.

17. See *Kroger v. O'Hara Twp.*, 481 Pa. 101, 117–118, 392 A.2d 266, 274 (1978), where Justice Manderino wrote:

> Although the view of the United States Supreme Court concerning proper guidelines for its interpretation of the federal constitution is not binding upon us in interpreting the Pennsylvania Constitution, we agree that we should be guided by the same principles in interpreting our Constitution. To do otherwise would be to place this Court's subjective value judgment as to what interest of the people are most important above the value judgment contained in our state Constitution. This we refuse to do.

18. See *Baltimore & Ohio Railroad Co. v. Commonwealth, Dept. of Labor & Industry*, 461 Pa. 68, 334 A.2d 636 (1975); *Tosto v. Pennsylvania Nursing Home Loan Agency*, 460 Pa. 1, 331 A.2d 198 (1975); *Stottlemeyer v. Stottlemeyer*, 458 Pa. 503, 329 A.2d 892 (1974).

19. See *Commonwealth v. Bonadio*, 490 Pa. 91, 415 A.2d 47 (1980); *Moyer v. Phillips*, 462 Pa. 395, 341 A.2d 441 (1975); *In re Cavill Estate*, 459 Pa. 411, 329 A.2d 503 (1975).

20. *Snider v. Thornburgh*, 496 Pa. 159, 436 A.2d 593 (1981) considered, *inter alia*, an equal protection attack on Pennsylvania's "Public Officials Ethics Law," Act of October 4, 1978, P.L. 883, as amended, 65 P.S. § 401 et seq., (Supp. 1980–1981).

*reasonable, not arbitrary, and rests upon a difference having a fair and substantial relation to the object of the legislation.*

Id. 496 Pa. at 168, 436 A.2d at 597 (Emphasis added). It would seem therefore, that under both the federal and state constitutions the proper test to be applied instantly is the "rational basis" test.

## C.

We turn now to the application of the "rational basis" test to determine whether the instant classification violates appellants' rights to equal protection of the laws under either the federal or state constitution.[21]

 A study of the legislative history reveals that the Legislature had two purposes in mind when it enacted the anti-obscenity statute. In the legislature's view, the growth of commercial pornography has exercised a pernicious effect on the sensibilities of the majority of our populace. By enacting the statute it hoped to combat these ill effects. However, the Legislature presumably recognized that even in meritless publications the scholar might find value, even if the "value" he finds is that the material has none.[22]

---

**21.** The application of the "rational basis" test to analyze equal protection claims under both Constitutions may proceed simultaneously for the meaning and purpose of the equal protection guarantees are sufficiently similar to warrant like treatment. See *Laudenberger v. Port Auth. of Allegheny Co.*, 496 Pa. 52, 436 A.2d 147 (1981).

**22.** *Cf.*, Milton, "Areopagitica:"

"And again, if it be true that a wise man, like a good refiner, can gather gold out of the drossiest volume, and that a fool will be a fool with the best book, yea or without book; there is no reason that we should deprive a wise man of any advantage to his wisdom, which we seek to restrain from a fool, that which being restrained will be no hindrance to his folly."

We are encouraged in this view by dicta from one of the earliest, and leading, "communist" cases, *Commonwealth v. Widovich*, 295 Pa. 311, 145 A. 295 (1929). The Supreme Court there made a distinction between preaching communism in its most violent forms, and teaching about communism; "Books treating historically of past revolutions, of the doctrines of various forms of government, books and essays on sociology and economics, which treat on the various

Secondly, the criminal elements of society have recently gained considerable financial influence over the population of the Commonwealth. The statute does not forbid, indeed constitutionally it could not, the private possession of pornography, nor does it even prohibit the populace's access to obscene material since the latter may be safely displayed in the exempted public institutions. What the statute does prohibit is the commercial exploitation of obscene materials by denying the right to sell them.[23]

Given the foregoing objectives of the legislation and the legitimate governmental interest implicit therein,[24] we can say without hesitation that the Legislature's creation of a class exempt from prosecution under the statute bears a rational relationship to its objectives in enacting the statute, thus the creation of this exempted class does not violate the right to equal protection under both Constitutions. Likewise, there is a fair and substantial relationship between the statute's objectives and the creation of the exempted class.

influences in government and their possible elimination, or their supposed peril, the writings of reformers—all these may be safely offered for sale or taught as they are now in our educational institutions." *Id.*, 295 Pa. at 319–320, 145 A. at 298. By analogy it is permissible to allow museums, libraries, and historical societies to collect and even display obscenity since their purpose is generally educational and not the commercial desire to propagate pornography.

**23.** Indeed, the legislative record reveals that several legislators felt that one of the primary evils of obscene publications is that they are considerably overpriced: "Therefore, the tenor and the aim of this type of legislation is to restrict people from buying these books or these periodicals or whatever they are—I do not buy them because some of them cost four or five bucks and it just is not worth it—but apparently there are quite a few people who are interested in purchasing this matter." Legislative Journal, Senate, 2015 (Nov. 8, 1977). "The worst part about the whole thing is they usually cost $5 or $10 and they are really not worth it. I bought one or two out of curiosity and spent too much money on them. You see one and you have seen them all." Legislative Journal, Senate, 377 (May 24, 1977). *And see* Legislative Journal, House, 2924 (October 19, 1977) (Purpose of Act is to eliminate "smut" stores, not to impose censorship).

**24.** Appellants have not challenged the Commonwealth's interest in enacting the legislation, *but see Commonwealth v. Bonadio, supra.*

By creating such a class as here, i.e. museums, libraries, historical societies, etc., there is created the legislative capability to defeat both the stranglehold of organized crime over legitimate businesses in the Commonwealth and to prevent the economic and moral exploitation of our citizenry. The anti-obscenity statute, Crimes Code Section 5903, 18 Pa.C.S. § 5903, therefore cannot be said to violate the guarantee of equal protection contained in either Pennsylvania's or the United States' Constitution.

Ordered, that the decree of the Court of Common Pleas of Cambria County, as amended to encompass only the eleven publications and four films named in the complaint and submitted for a determination of obscenity to the jury, is affirmed.